UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AIR EXCURSIONS LLC | * | |
| 8907 Yandukin Drive | * | |
| Juneau, Alaska  99801 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-1769 |
| | * | |
| JANET L. YELLEN, in her official capacity | * | |
| as Secretary of the United States Department | * | |
| of the Treasury | * | |
| 1500 Pennsylvania Avenue, NW | * | |
| Washington, DC  20220 | * | |
| | * | |
| and | * | |
| | * | |
| UNITED STATES DEPARTMENT OF | * | |
| THE TREASURY | * | |
| 1500 Pennsylvania Avenue, NW | * | |
| Washington, DC  20220 | * | |
| | * | |
| Defendants. | * | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Air Excursions LLC ("Air Excursions"), by counsel, states as follows as its

Complaint for Declaratory and Injunctive Relief against Defendant Janet L. Yellen, in her

official capacity as Secretary of the United States Department of the Treasury, and Defendant

United States Department of the Treasury ("Treasury"):

**Introduction**

1.  Treasury's objective in implementing the Coronavirus Aid, Relief, and Economic

Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), as stated on its

website, is "ensuring that the [CARES] programs achieve their intended purpose, provide for accountability and transparency, and are free from fraud and abuse."  As described herein, Treasury has disbursed over $30 million in Payroll Support Program ("PSP") funds made available by the CARES Act and other federal statutes to a recipient that was not entitled to receive them.  By providing this windfall, Treasury violated the foregoing statutes, failed to achieve the PSP's "intended purpose" of supporting air carrier workers and caused Air Excursions to sustain economic injury.  Granting of the relief requested in this Complaint for Declaratory and Injunctive Relief is the only way to prevent Treasury from continuing to distort the relevant passenger air services markets by rendering the ineligible funds recipient as the "winner" in those markets over current competitors and potential new entrants, including Air Excursions.

## Parties

2.  Plaintiff Air Excursions LLC is an Alaska limited liability company that was formed in 1999 and has its principal place of business at 8907 Yandukin Drive, Juneau, Alaska 99801.  Air Excursions and Kalinin Aviation LLC ("Kalinin") both do business as "Alaska Seaplanes" and operate common branded flights using that trade name.  Air Excursions and Kalinin are wholly owned by Kalinin Holdings, Inc.

3.  Air Excursions is a Federal Aviation Administration-certificated air carrier operating pursuant to 14 C.F.R. Parts 119 and 135 of the Federal Aviation Regulations, and the company holds a United States Department of Transportation ("DOT") Certificate of Public Convenience and Necessity.  As Alaska Seaplanes, Air Excursions and Kalinin

provide (i) commuter air transportation in the Alaska markets of Juneau, Angoon, Elfin Cove, Excursion Inlet, Gustavus, Haines, Hoonah, Kake, Klawock, Pelican, Petersburg, Sitka, Skagway and Tenakee Springs, and in the Canada market of Whitehorse, Yukon, (ii) custom charter air transportation throughout Southeast Alaska, Western Canada and the Pacific Northwest, and (iii) air freight, United States mail and United Parcel Service all-cargo air transportation throughout Southeast Alaska, Western Canada and the Pacific Northwest.

4.  Defendant Janet L. Yellen is the Secretary of the United States Department of the Treasury and is sued in her official capacity.

5.  Defendant United States Department of the Treasury is an agency of the United States government.  Treasury is responsible for, among other things, the disbursement of United States government funds under the CARES Act.

### Jurisdiction and Venue

6.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Air Excursions asserts claims under the CARES Act, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and other federal statutes, as noted below.  Thus, this action presents a federal question "arising under the Constitution, laws, or treaties of the United States."

7.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because Defendant Janet L. Yellen is an officer of the United States Department of the Treasury, Defendant United States Department of the Treasury is an agency of the United

States government and a substantial part of the actions or omissions giving rise to Air Excursions's claims occurred in this District.

## Facts

### A.  Payroll Support Under the CARES Act and Subsequent Federal Legislation

8.  The CARES Act was signed into law on March 27, 2020.  Through Division A, Title IV, Subtitle B, "Air Carrier Worker Support," of the CARES Act, Congress provided up to $25 billion in payroll support funds for passenger air carriers to "exclusively be used for the continuation of payment of employee wages, salaries, and benefits."  15 U.S.C. § 9072(a).

9.  The CARES Act provides that "[f]inancial assistance provided to an air carrier or contractor under this subtitle shall be in such form, on such terms and conditions (including requirements for audits and the clawback of any financial assistance provided upon failure by a passenger air carrier, cargo air carrier, or contractor to honor the assurances specified in section 4114), as the Secretary determines appropriate."  15 U.S.C. § 9073(b).

10.  Through the Airline Worker Support Extension provisions of the Consolidated Appropriations Act, 2021 ("the CAA"), which was signed into law on December 27, 2020, Congress authorized an additional $15 billion in payroll support for passenger air carriers.

11.  Through the Air Transportation Payroll Support Program Extension provisions of the American Rescue Plan Act of 2021 ("the ARP"), which was signed into law on March 11, 2021, Congress authorized an additional $14 billion in payroll support for passenger air carriers.

**B.      Corvus Airlines, Inc. Applies for Payroll Support Funds**

12.  Corvus Airlines, Inc. ("Corvus") was formed as a corporation in the State of Washington on January 14, 1959, under the name "Era Helicopters, Inc."  The company operated helicopters to support offshore oil drilling operations and, later, fixed-wing aircraft to support the construction of the trans-Alaska pipeline.

13.  By its Order 83-6-47, issued on June 16, 1983, DOT found Corvus fit to engage in interstate passenger air transportation, and Corvus thereafter provided scheduled air transportation as a certificated air carrier.

14.  On or about April 3, 2020, Corvus submitted an application to Treasury for a PSP grant under the CARES Act.

15.  On or about April 5, 2020, Corvus filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"), commencing Case No. 20-10759.

16.  On or about April 5, 2020, according to the sworn declaration of Corvus's Chief Financial Officer filed in Case No. 20-10759, Corvus "laid off almost all of its remaining workforce, other than a very small number of employees necessary to the administration of" the bankruptcy case and ceased all of its operations.

17.  By an order entered on April 8, 2020, the Bankruptcy Court consolidated that case with other Chapter 11 cases for related debtors in the case *In re Ravn Air Group, Inc. et al.*, Case No. 20-10755 ("the Main Case").

18.  On or about May 14, 2020, Corvus received correspondence from Treasury indicating that it had been conditionally approved to move forward with its PSP application.

19.  On or about June 5, 2020, Treasury sent Corvus a PSP Agreement to execute.

20.  On June 23, 2020, Corvus and the other debtors filed an "Emergency Motion" in the Main Case seeking "an Order Authorizing Entry Into Payroll Support Program Agreements and Granting Related Relief."

21.  A PSP Agreement was attached as an exhibit to the Emergency Motion; it shows "Corvus Airlines, Inc." as "Recipient," with a PSP Participant Number of PSA-2004031350 and an Employer Identification Number of 92-0027666.

22.  The PSP Agreement defines "Recipient" to include "the Signatory Entity" and its "successors, and assigns."  Paragraph 48 provides that the Agreement "shall bind and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns."  By an Order entered on June 28, 2020, the Bankruptcy Court granted the Emergency Motion.

23.  The PSP Agreement requires that "[t]he Recipient shall use the Payroll Support exclusively for the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient."

C.    **The Sale of Corvus's Assets**

24.  By an order entered on June 26, 2020, the Bankruptcy Court confirmed the "Chapter 11 Plan of Liquidation" that Corvus and the other debtors in the Main Case had

proposed.  That order provided for the "the speedy yet efficient disposition" of the assets of

Corvus and the other debtors.

25.  Thus, unlike the typical Chapter 11 case, in which the debtor reorganizes, gets

debts discharged and emerges from the case to continue its operations, Corvus opted to sell

its assets and discontinue its operations.

26.  And that it is exactly what Corvus did.  By a notice filed on July 30, 2020 in the

Main Case, Corvus and the other debtors identified the purchasers of certain of their assets.

One purchaser of assets that the notice identified was FLOAT Shuttle, Inc.

27.  FLOAT Shuttle, Inc. is a part owner of FLOAT ALASKA LLC ("FLOAT"), a

Delaware limited liability company that was formed on July 10, 2020.  Upon information and

belief, since its formation FLOAT has been holding itself out to the public as "Corvus

Airlines, Inc. dba Ravn Alaska" or "Corvus Airlines d/b/a Ravn Alaska."

28.  By an Order entered on August 5, 2020 ("the Sale Order"), the Bankruptcy Court

approved an Asset Purchase Agreement among Corvus, FLOAT and the other debtors in the

Main Case.

29.  In exchange for a purchase price of $8,000,000, Corvus and the other debtors

agreed to sell to FLOAT, among other things:  (i) six Dash 8-100 aircraft, one Saab 340-B

aircraft, ground support equipment and certain intellectual property (including the trade name

"Corvus" and its corporate name), (ii) "all of the capital stock of Corvus Airlines, Inc., a

Washington corporation," (iii) "Seller's Air Carrier Certificate(s) and Operations

Specifications issued by the FAA under 14 CFR Part 121," and (iv) "all right, title, and

interest of the Seller in and to any and all federal loans, grants, subsidies, or other forms of

funding with respect to Corvus and/or the Part 121 Certificates, including, without limitation,

to monies or rights to monies pursuant to the Coronavirus Aid, Relief, and Economic

Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) and any amendments and

any account opened to hold such monies."

30.  In the Sale Order, the Bankruptcy Court expressly and repeatedly made it clear

that FLOAT ("the Buyer") is not the successor to Corvus or the other debtors ("the

Debtors"):

> The Buyer is not a mere continuation of the Debtors or their
> estates, or any of them, and there is no continuity of enterprise
> between the Buyer and the Debtors, or any of them.  The Buyer
> is not holding itself out to the public as a continuation of the
> Debtors.  The Buyer is not a successor to the Debtors or their
> estates by reason of any theory of law or equity, and the
> Transaction does not amount to a consolidation, merger, or *de
> facto* merger of the Buyer and the Debtors, or any of them.

Sale Order at 4, Section V.K.

> Upon the consummation of the Sale of the Acquired Assets to
> Buyer, (a) Buyer shall not be, as a result of the purchase of the
> Acquired Assets or otherwise, considered to have continued the
> business operations associated with the Acquired Assets without
> interruption or substantial change, and (b) substantial continuity
> in the operation of the Debtors' business before and after the
> purchase of the Acquired Assets shall not be considered to exist.

Sale Order at 7, Section VII.P.

> Buyer shall not be deemed to be a successor to the Debtors, or
> otherwise liable, for any liability of the Debtors under ERISA or
> otherwise.

Sale Order at 7, Section VII.Q.

8

Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA, the Buyer shall not be liable for any Claims or Liens against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets except as expressly assumed under the APA.

Sale Order at 18, Section V.27.

Except as provided in the APA and this Sale Order and without limiting other applicable provisions of this Sale Order, the Buyer is not, by virtue of the consummation of the Transaction, assuming, nor shall it be liable or responsible for, as a successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity.

Sale Order at 20, Section V.31.

Buyer shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity.

Sale Order at 21, Section V.32.  A copy of the Sale Order is attached as Exhibit A hereto.

31.  Upon information and belief, the parties to the foregoing Asset Purchase Agreement closed on the transaction on August 7, 2020.

9

32.  Upon information and belief, Treasury approved its execution of the foregoing PSP Agreement based on the mistaken belief of its Payroll Support Program Decision Committee that Corvus "was purchased at auction due to bankruptcy," when, in fact, Corvus was taken apart in the Main Case and sold, piece by piece, to FLOAT and other purchasers. As a result, the Corvus entity that had submitted the PSP Application in April 2020 no longer existed as of the closing.

**D.     Treasury Disburses Payroll Support Funds to an Ineligible Recipient**

33.  Upon information and belief and based on the PSP Agreement, in or about August 2020, Treasury disbursed to "Corvus Airlines, Inc." CARES Act Payroll Support funds totaling $10,297,313.

34.  Upon information and belief and based on the PSP Agreement, the actual recipient of the funds was FLOAT, acting under the theory that it is the successor to Corvus, a defunct and bankrupt entity with no assets or operations.

35.  However, given the express terms of the Sale Order, FLOAT is not the successor to Corvus.  The Sale Order's terms on the successor issue are clear and enforceable.  Because FLOAT is not the successor to Corvus, FLOAT was not eligible to receive the Payroll Support funds.

36.  In a proceeding before DOT, FLOAT argued that it was the successor to Corvus, but DOT declined to address this issue:

> With respect to Alaska Central's allegation that the Department failed to address the legal status of Corvus as the successor company of the previous Corvus, we reiterate our position that this issue is not relevant to our fitness determination. . . .  Based

> on our review of the record, we tentatively found Corvus fit,
> willing, and able to resume operations and the issue of Corvus's
> legal status has no bearing on our tentative findings of Corvus's
> fitness in Order 2020-10-6.

DOT Order 2020-11-18 (served November 20, 2020).

37.  Thus, upon information and belief, there has been no ruling by DOT, or any other regulatory or judicial authority, disturbing the Bankruptcy Court's multiple determinations in the Sale Order that FLOAT is not the successor to Corvus.

38.  Upon information and belief, FLOAT, again acting under the baseless theory that it is the successor to Corvus, applied on or about January 11, 2021 for Payroll Support funds under the CAA.  Upon information and belief, in or about April 2021, Treasury disbursed CAA Payroll Support funds totaling $10,478,223 to FLOAT in response to its application.

39.  Upon information and belief, FLOAT, again acting under the baseless theory that it is the successor to Corvus, applied for Payroll Support funds under the ARP.  Upon information and belief, in or about April 2021, Treasury disbursed ARP Payroll Support funds totaling $9,773,038 to FLOAT in response to its application.

**E.     Treasury's Unlawful Disbursements Have Caused Air Excursions to Sustain Economic Injury in Fact**

40.  After Corvus ceased operations in April 2020, Air Excursions developed a plan to begin passenger air transportation on certain routes in Alaska that Corvus had served, including between Anchorage and Dutch Harbor.  By a press release issued on or about July 28, 2020, Air Excursions (as Alaska Seaplanes) announced its plan publicly.

41. Aided by Treasury's unlawful disbursements, beginning in or about November 2020, FLOAT began providing passenger air transportation on certain of the routes that Air Excursions intended to serve, including between Anchorage and Dutch Harbor.

42. In 2021, Air Excursions has attempted to implement its plan referenced above. To that end, in March 2021 Air Excursions attempted to obtain commuter aircraft gate space at Ted Stevens Anchorage International Airport ("ANC") for charter operations using Embraer 145 aircraft. FLOAT, as Ravn Alaska, has leased all of the commuter aircraft gates at ANC, although, upon information and belief, it is actually using only about half such gates. As required by the airport's management, Air Excursions approached FLOAT to discuss subleasing gate space. FLOAT refused to negotiate in good faith, so no sublease agreement was reached.

43. By its disbursements, Treasury has improperly subsidized FLOAT with a windfall that it did not earn and was not entitled to receive, thereby allowing FLOAT to suppress existing competition and prevent potential market entrants. Among other things, Treasury's actions have enabled FLOAT to prevent Air Excursions from entering the Anchorage-Dutch Harbor passenger air transportation market, causing Air Excursions to sustain an economic injury in fact.

44. Granting of the relief that Air Excursions requests in this action would likely redress Air Excursions's injury in fact. FLOAT would lose Treasury's improper subsidies, which would likely cause FLOAT to curtail its anticompetitive conduct.

## Count I – Declaratory and Injunctive Relief Under the APA

45.  Air Excursions restates and incorporates herein by reference paragraphs 1 through 44 of this Complaint for Declaratory and Injunctive Relief.

46.  Treasury's disbursement of Payroll Support funds, as described above, constitutes final agency action within the meaning of 5 U.S.C. § 704.  Air Excursions has no other adequate remedy in a court.  Accordingly, Treasury's disbursement of such funds is subject to judicial review under 5 U.S.C. § 704.

47.  Treasury disbursed Payroll Support funds, as described above, to an ineligible recipient.  In so doing, Treasury violated the CARES Act, the CAA and the ARP and its actions were, within the meaning of 5 U.S.C. § 706(2), arbitrary and capricious, an abuse of discretion, contrary to law or otherwise not in accordance with law, in excess of statutory jurisdiction, authority or limitations and without observance of procedure required by law.

48.  As a direct and proximate result of Treasury's acts and omissions, Air Excursions is likely to sustain economic injuries and thus, pursuant to 5 U.S.C. §§ 702, 705 and 706 and 28 U.S.C. §§ 2201 and 2202, Air Excursions is entitled to (i) declaratory and injunctive relief setting aside Treasury's disbursement of Payroll Support funds as described above, (ii) declaratory and injunctive relief prohibiting Treasury from disbursing additional Payroll Support funds to FLOAT, and (iii) an award of its reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412.

49.  This cause of action is not an attempt to collect or recover a claim against any debtor within the meaning of 11 U.S.C. § 362, and Air Excursions disclaims any such attempt or any other act that may be considered to violate 11 U.S.C. § 362.

### Request for Relief

WHEREFORE, Plaintiff Air Excursions LLC requests that the Court:

a.  Enter judgment pursuant to 5 U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 2201 and 2202 declaring that (i) Defendants disbursed Payroll Support funds, as described above, to an ineligible recipient, (ii) by their actions, Defendants violated the CARES Act, the CAA and the ARP, and (iii) Defendants' actions were, within the meaning of 5 U.S.C. § 706(2), arbitrary and capricious, an abuse of discretion, contrary to law or otherwise not in accordance with law, in excess of statutory jurisdiction, authority or limitations and without observance of procedure required by law;

b.  Award preliminary and permanent injunctive relief pursuant to 5 U.S.C. §§ 702, 705 and 706 directing that Defendants (i) take remedial measures, including without limitation the exercise of clawback authority under 15 U.S.C. §§ 9073 and 9093, as to the Payroll Support funds that Treasury disbursed as described above, and (ii) refrain from any additional disbursements to FLOAT purporting to act as the successor to Corvus;

c.  Award Air Excursions its reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

d.  Award such other legal or equitable relief as the Court deems proper.

Respectfully submitted,

Dated:  July 1, 2021          /s/ Kenneth S. Nankin
                             Kenneth S. Nankin (DC Bar No. 420058)
                             Nankin & Verma PLLC
                             700 King Farm Boulevard, Suite 550
                             Rockville, Maryland  20850
                             (202) 463-4911 - telephone
                             (202) 463-6177 - fax
                             ksn@nankin.com

                             Counsel for Plaintiff Air Excursions LLC

15