**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————————— ) | |
| AIR EXCURSIONS, LLC,            ) | |
|          ) | |
|       **Plaintiff,**     ) | |
|      v.            ) | **Case No. 21-1769 (TNM)** |
|         ) | |
| JANET L. YELLEN, in her official capacity as ) | |
|    Secretary of the Treasury, *et al.,*   ) | |
|         ) | |
|      **Defendants.**     ) | |
| ———————————————————————— ) | |

**DEFENDANTS' MOTION TO DISMISS**

Defendants Department of the Treasury ("Treasury") and Janet L. Yellen, in her capacity as Secretary of the Treasury (the "Secretary"), by and through undersigned counsel, respectfully move pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6) to dismiss the Complaint filed in this matter.   Accompanying this motion is a supporting memorandum, supporting declaration and exhibits, and a proposed order.

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. BAR #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendants

# <u>TABLE OF CONTENTS</u>

Memorandum of Points and Authorities……………………………………………………..1

Facts ........................................................................................................................... 4

Standard of Review.................................................................................................... 9

Argument .................................................................................................................. 13

      I.      Plaintiff Lacks Standing................................................................... 15

      II.     The Terms and Conditions of Treasury's Payroll Support Disbursements Were Committed to Agency Discretion and Are Not Justiciable under the APA.......... 24

      III.    Plaintiff Has Failed To State A Claim. ............................................. 31

      IV.    Plaintiff Has Failed To Meet Its Burden For Preliminary Injunctive Relief…….33

Conclusion ................................................................................................................. 35

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Al-Owhali v. Ashcroft*,
  279 F. Supp. 2d 13 (D.D.C. 2003) ........................................................................ 10

*Ark Initiative v. Tidwell*,
  749 F.3d 1071 (D.C. Cir. 2014) ............................................................................ 15

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) ........................................................................ 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 11

*Baltimore Gas & Elec. v. FERC*,
  252 F.3d 456 (D.C. Cir. 2001) ....................................................................... 24, 30

*Bartko v. Dep't of Just.*,
  Civ. A. No. 13-1135 (JEB), 2015 WL 13673371 (D.D.C. Mar. 12, 2015) ............ 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 11

*Bristol-Myers Squibb Co. v. Shalala*,
  91 F.3d 1493 (D.C. Cir. 1996) ............................................................................. 18

*CC Distributors, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ............................................................................. 26

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 12, 13

*CityFed Fin. Corp. v. OTS*,
  58 F.3d 738 (D.C. Cir. 1995) ......................................................................... 13, 33

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................... 15

*Confederated Tribes of the Chehalis Reservation v. Mnuchin*,
  456 F. Supp. 3d 152 (D.D.C. 2020) ..................................................................... 27

*Connecticut v. Dep't of Interior*,
  344 F. Supp. 3d 279 (D.D.C. 2018) ..................................................................... 33

*Curran v. Holder*,
  626 F. Supp. 2d 30 (D.D.C. 2009) ......................................................................... 9

*Damus v. Nielsen*,
  2018 WL 3232515 (D.D.C. 2018) ........................................................................ 12

*Davis v. FEC*,
  554 U.S. 724 (2008) ............................................................................................... 16

*Drake v. F.A.A.*,
  351 U.S. App. D.C. 409, 291 F.3d 59 (D.C. Cir. 2002) ....................................... 25

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ............................................................................. 12

*El Paso Natural Gas v. FERC*,
  50 F.3d 23 (D.C. Cir. 1995) ................................................................................. 18

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ..................................................................... 10

*Farris v. Rice,*
  453 F. Supp. 2d 76 (D.D.C. 2006) ............................................................ 13, 34
*Florida Audubon Soc. v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ..................................................................... 22
*Goodwin v. Sec'y of HUD,*
  356 F.3d 310 (D.C. Cir. 2004) ................................................................... 24
*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................... 10
*Gull Airborne Instruments, Inc. v. Weinberger,*
  694 F.2d 838 (D.C. Cir. 1982) ................................................................... 19
*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................................... 24
*Henke v. Dep't of Interior,*
  842 F. Supp. 2d 54 (D.D.C. 2012) ............................................................ 13, 34
*Herbert v. Nat'l Acad. of Scis.,*
  974 F.2d 192 (D.C. Cir. 1992) ................................................................... 10
*Hospitality Staffing Solutions, LLC v. Reyes,*
  736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................... 12
*Jerome Stevens Pharmacy, Inc. v. FDA,*
  402 F.3d 1249 (D.C. Cir. 2005) ................................................................. 10
*Jovanovic v. US-Algeria Bus. Council,*
  561 F. Supp. 2d 103 (D.D.C. 2008) ........................................................... 11
*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ..................................................................................... 9
*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................... 12, 13
*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,*
  507 U.S. 163 (1993) ................................................................................... 10
*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................................... 25
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................. 15, 16, 17, 21
*Mdewakanton Sioux Indians of Minnesota,*
  255 F. Supp. 3d 48 (D.D.C. 2017) ............................................................ 33
*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................... 19, 20, 21
*Nguyen v. Dep't of Homeland Sec.,*
  460 F. Supp. 3d 27 (D.D.C. 2020) ............................................................ 22, 23
*Oryszak v. Sullivan,*
  576 F.3d 522 (D.C. Cir. 2009) ................................................................... 24
*Physicians for Soc. Resp. v. Wheeler,*
  956 F.3d 634 (D.C. Cir. 2020) ................................................................... 25
*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ................................................................... 15
*Pursuing Am.'s Greatness v. FEC,*
  831 F.3d 500 (D.C. Cir. 2016) ................................................................... 12

*Sampson v. Murray*,
    415 U.S. 61 (1974).................................................................................................... 33

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................................. 12

*United Farm Workers v. Chao*,
    593 F. Supp. 2d 166 (D.D.C. 2009) ......................................................................... 13

*United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer*,
    778 F. Supp. 2d 37 (D.D.C. 2011) ........................................................................... 10

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................................................. 15

*Washington v. DOJ*,
    164 F. Supp. 3d 145 (D.D.C. 2016) ......................................................................... 24

*Webster v. Doe*,
    486 U.S. 592 (1988).................................................................................................. 26

*Wendland v. Gutierrez*,
    580 F. Supp. 2d 151 (D.D.C. 2008) ......................................................................... 25

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018)................................................................................................ 25

*Winter v. NRDC*,
    555 U.S. 7 (2008)............................................................................................... 12, 34

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................................................ 13, 34

**Statutes**

5 U.S.C. § 701(a)(2) ........................................................................................................ 24
5 U.S.C. § 704 ................................................................................................................. 24
5 U.S.C. §§ 701-706 ........................................................................................................ 24
49 U.S.C. § 40102(a)(2) .................................................................................................. 26

**Regulations**

2 CFR Part 180................................................................................................................ 29

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| **AIR EXCURSIONS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 21-1769 (TNM)** |
| ) | |
| **JANET L. YELLEN, in her official capacity as** ) | |
| **Secretary of the Treasury,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

---

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants Department of the Treasury ("Treasury") and Janet L. Yellen, in her capacity

as Secretary of the Treasury (the "Secretary"), oppose Plaintiff's motion for preliminary injunction

for the reasons discussed below.  On the same grounds as set forth below, Defendants move to

dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

**INTRODUCTION**

In response to the sudden economic disruption caused by the COVID-19 pandemic,

Congress enacted in March 2020 the Coronavirus Aid, Relief, and Economic Security ("CARES")

Act, 134 Stat. 281 (2020), which, among other things, authorized the Secretary to provide financial

assistance on an expedited basis to air carriers for the purpose of supporting their payroll to avoid

layoffs (hereinafter, Payroll Support Program or "PSP").  *Id*. at § 4112.[1]  Subsequent Payroll

---

[1]     The Act afforded the Secretary five days from its enactment to publish "streamlined and
expedited procedures" for air carriers to apply for payroll assistance and directed that initial
payments to recipients whose requests were approved by the Secretary should begin "not later
than" 10 days after the Act's enactment.  *Id*. at § 4113(b)(1)(B) and (2).   The application
procedures are set forth on the standard application form developed by Treasury. (Leibenluft Decl.
¶ 3 and Ex. 1).

Support Program payments were authorized by the Consolidated Appropriations Act, 2021, 134 Stat. 1182, at 2052-061 (2021), and American Rescue Plan Act of 2021, 135 Stat 4, at 104-07 (2021). The approximately $30 million in Payroll Support Program payments to Corvus Airlines ("Corvus") at issue in this litigation were made in installments under all three Acts pursuant to separate PSP Agreements. (Leibenluft Decl. ¶ 10). The final payment was disbursed in May 2021, and there are no further payments to be made to Corvus. (Leibenluft Decl. ¶¶ 10-11).

The instant lawsuit, filed on July 1, 2021, is brought under the Administrative Procedure Act ("APA") by Air Excursions, LLC ("Air Excursions"), which itself was a recipient of Payroll Support Program payments. (Leibenluft Decl. ¶ 14).[2] Air Excursions claims without basis that it has standing to ask this Court to direct Treasury to claw back the payroll support payments made to Corvus on the faulty premise that Corvus – indisputably an "air carrier" under the CARES Act and subsequent legislation – was not a lawful recipient of such payments. Air Excursions bases this lawsuit on out-of-context snippets from a bankruptcy court order, which it contends forecloses any payments to Corvus, even though the same order expressly contemplates that such payments would be made. Air Excursions now seeks as "preliminary" injunctive relief an order directing a clawback of all such payroll support funds. Air Excursions seeks what amounts to a mandatory injunction, as opposed to maintenance of the status quo, without even attempting to establish that it would suffer irreparable harm in the absence of the requested injunctive relief. Air Excursions also seeks an order directing Treasury to refrain from any additional disbursements to Corvus, disregarding the fact that there are no further disbursements to be made.

---

[2]    Air Excursions received approximately $250,000 in PSP payments. (Leibenluft Decl. ¶ 14). Kalinin Aviation, LLC, which together with Air Excursions operates Alaska Seaplanes (Compl. ¶ 2), also received a combined total of over $6 million in PSP assistance. (Leibenluft Decl. ¶ 15)

Air Excursions lacks standing to assert this claim because (1) its asserted injury – vague speculation about a lost business opportunity arising from Corvus's continued service of certain air passenger routes in Alaska – is not within the zone of interest that the applicable statutes sought to protect by authorizing payroll support payments; (2) its asserted injury is not causally related to the PSP payments that Treasury made to Corvus; and (3) its asserted injury is not redressable by the relief requested.

Apart from the lack of standing, the issues that Plaintiff raises under the APA – namely, whether Corvus was compliant with the terms and conditions established by Treasury for receipt of such funds and the appropriate remedy in the counterfactual event that Treasury were to deem Corvus non-compliant – are matters solely within Treasury's discretion and thus are not actionable under the APA.  Finally, as explained below, Plaintiff also has failed plausibly to plead that Corvus was not a "recipient" as that term was contractually defined in Corvus's payroll support agreements with Treasury, even under the strict reading of that definition that Air Excursions advances.

In addition to these legal defects, the larger context in which these claims have been made bears noting.  This lawsuit appears to be the most recent step in an ongoing strategy by Air Excursions to prevent Corvus from continuing to offer passenger air transportation over certain routes in Alaska – a market that Air Excursions apparently wants to enter and dominate.  Prior to the filing of this lawsuit, Air Excursions sought unsuccessfully to purchase the assets of Corvus in that entity's bankruptcy proceeding.  Following the bankruptcy-court approved sale of those assets to the successful bidder, FLOAT ALASKA, LLC ("FLOAT"), Air Excursions objected unsuccessfully to Corvus resuming operations under FLOAT's ownership by asking the Department of Transportation to reverse its preliminary decision that Corvus was fit to hold the

required certificate to serve as an air carrier.  Now, Air Excursions is seeking to enlist this Court in an apparent effort to undermine the finances of its competitor by seeking an order directing Treasury to claw back the PSP payments that have been made to Corvus.

For reasons addressed below, the Complaint should be dismissed for lack of jurisdiction and failure to state a claim.  In addition, because Air Excursions cannot establish a likelihood of success on the merits, and also has failed to meet its burden of showing irreparable harm or that an injunction would be in the public interest (as opposed to Air Excursions' competitive interest), the motion for preliminary injunction also should be denied.

## FACTS

### I.   Treasury's Payment To Corvus Under The First PSP Agreement

On April 3, 2020, Corvus, a subsidiary of Ravn Air Group, Inc., applied for payroll support assistance under the CARES Act.  (Ex. 1 to Leibenluft Decl.).  Two days later, Ravn Air Group, along with certain subsidiaries including Corvus, filed for bankruptcy protection under Chapter 11.  *See In re Ravn Air Group, Inc.,* Case No. 20-10755 (Bankr. Del.).[3]

During the pendency of the bankruptcy proceeding, Treasury conditionally approved Corvus's PSP application and sent Corvus a PSP Agreement and Bankruptcy Addendum to execute, which Corvus signed after obtaining approval from the bankruptcy court to do so. (Compl. ¶¶ 18-19, 20, 22).  To support its motion for bankruptcy court approval to sign this agreement, Corvus explained as the requisite business need that most third parties had conditioned their bids for Corvus's assets on the right to receive Corvus's payroll support funds and that "the

---

[3]      The debtors in the bankruptcy were:  Ravn Air Group, Inc., Ravn Air Group Holdings, LLC, JJM, Inc., HoTH, Inc., Peninsula Aviation Services, Inc., Corvus Airlines, Inc., Frontier Flying Service, Inc., and Hageland Aviation Services, Inc.  (Ex. C to Pl. Mot. at 1 n.1).

majority of the funds available under the PSP" program would "be used by the purchaser of the Debtors' assets as a going concern" rather than by the Debtors prior to the asset sale.  (Case No. 20-10755 (Bankr. Del.), ECF No. 377 at 6, 8).  Corvus emphasized that expedited approval of the motion was "important to satisfying potential bidders that the PSP" funds "will be available, subject to Treasury approval of a sale transaction, as bidders conduct their diligence and prepare bids in advance of the June 24 [2020] bid deadline and any subsequent auction." (*Id.*).  The bankruptcy court approved that motion on June 28, 2020 (*id.*, ECF No. 408), and did so with knowledge that the purchaser of Corvus's stock and assets (ultimately FLOAT) would receive the payroll support payments.  Treasury signed the PSP Agreement on July 22, 2020 (the "first PSP Agreement" or "PSP1 Agreement") and the Bankruptcy Addendum on July 28, 2020.  (Ex. 2 and 3 to Leibenluft Decl.).

On July 9, 2020, FLOAT was named the successful bidder for the purchase of the Debtors' assets and, by order dated August 5, 2020, the bankruptcy court approved an Asset Purchase Agreement between the Debtors (including Corvus) and FLOAT.  (Case No. 20-10755, ECF No. 434-1 and ECF No. 492 and 492-1).  The transferred assets included the capital stock of Corvus, "substantially all assets" of Corvus, as well as "all right, title, and interest of the Seller in and to any and all federal loans, grants, subsidies, or other forms of funding with respect to Corvus and/or the Part 121 Certificates, including, without limitation, to monies or rights to monies pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act." (*Id.*, ECF No. 434-1 and ECF No. 492-1 at § 1.1(f) and (k)). Under the Asset Purchase Agreement approved by the

bankruptcy court, the PSP Agreement executed in July 2020 was assigned to FLOAT, with disbursements to be made to New Corvus.[4]  (*Id*., ECF No. 492-1 at § 5.6(e) & § 7.2(e))

Treasury made the first PSP payment of approximately $2.5 million to New Corvus on September 4, 2020.  (Leibenluft Decl. ¶ 10).  Subsequent payments were made to New Corvus under the first PSP Agreement in November 2020 and March 2021 for a total payment of approximately $10.3 million under that Agreement.  (*Id*.)

## II.    Treasury's Payments to New Corvus Under PSP2 and PSP3 Agreements

On January 11, 2021, New Corvus applied for a payroll assistance payment under the Consolidated Appropriations Act, 2021, 134 Stat. 1182, at 2052-061 (2021), and New Corvus and Treasury executed a Payroll Support Program Extension Agreement ("PSP2 Agreement") in April 2021.   (Ex. 4 and 5 to Leibenluft Decl.).  New Corvus received a total of approximately $10.3 million in three installments in April 2021 pursuant to that Agreement.  (Leibenluft Decl. ¶ 10).  New Corvus was the applicant for this assistance, not pre-bankruptcy Old Corvus.  (Ex. 4 to Leibenfult Decl.).

On April 21, 2021, Treasury executed a third PSP Agreement with New Corvus under the American Rescue Plan Act of 2021.  (Ex. 6 to Leibenluft Decl.) ("PSP3 Agreement").  Treasury made payments of approximately $10 million to New Corvus in two installments under that Agreement, the last of which was made on May 27, 2021.  (Leibenluft Decl. ¶ 10).   No further payments are scheduled.  (*Id*. ¶ 11).

---

[4]     In the remainder of this brief, we refer to the Ravn Air Group subsidiary Corvus Airlines as "Old Corvus", and the post-bankruptcy, FLOAT-owned Corvus Airlines as "New Corvus."

**III.    Air Excursions' Efforts To Obtain Corvus's Air Passenger Routes In Alaska.**

During the bankruptcy proceeding, various third parties submitted bids to acquire Old Corvus' assets.  Air Excursions, which along with Kalinin Aviation does business as Alaska Seaplanes, tendered several offers for the debtors' assets during the bankruptcy process in an effort to obtain Old Corvus's air passenger routes in Alaska.  (ECF No. 9-1, Craford Decl. ¶¶ 3, 5 and Ex. 1 thereto).  Air Excursions asserted that its bid was "unquestionably superior" to FLOAT's bid, citing, among other things, FLOAT's "closing condition" of "Corvus CARES funds/rights transfer."  (Case No. 20-10755, ECF No. 485 at 6 ¶ 10).  Although characterizing that as a "disguised condition[]" to obtain "government approval of the transfer of CARES Act rights,"  Air Excursions did not object to the asset sale to FLOAT (*id.*), which the bankruptcy court approved.[5]

After FLOAT was identified as the successful bidder, Air Excursions, under its trade name Alaska Seaplanes, publicly announced on July 28, 2020, a plan to compete for the routes serviced by Old Corvus.  (ECF No. 9-1 at ECF Page 7).  In that press announcement, Air Excursions stated that it "will relaunch passenger air service on routes formerly served by . . . Corvus."  (*Id.*).  The announcement further explained that Air Excursions had made an unsuccessful attempt to obtain Old Corvus's assets during the bankruptcy process and that it remained "undeterred."  (*Id.*).  The

---

[5]    The order approving the sale stated that "All objections to the Sale Motion, the Transaction, or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice. Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code." (Ex. C to Pl.'s Mot. at ¶ 3)  The bankruptcy docket does not reflect any "objections" filed by Air Excursions to the asset sale, but only a "statement" regarding its "bid position." *See* Case No. 20-10755, ECF No. 485.

route specified in the press release encompassed Dutch Harbor/Unalaska with direct flights from Anchorage.  (*Id*.)

On August 11, 2020, New Corvus (now owned by FLOAT) filed a notice with the Department of Transportation to resume its scheduled passenger service and, on October 13, 2020, the Department of Transportation issued a decision tentatively approving that request.  *In re Corvus Airlines, Inc*., Docket DOT-OST-2020-0134 (Ex. 1 hereto).  Air Excursions' parent company, Kalinin Holdings (ECF No. 9-1, Craford Decl. ¶ 2), attempted to prevent New Corvus from resuming operations by filing an objection with the Department of Transportation.  (Ex. 2 hereto).  The Department of Transportation overruled that objection and issued a final order allowing New Corvus to resume operations on November 20, 2020.  (*Id*.)  According to the Complaint, beginning in November 2020, "FLOAT began providing passenger air transportation on certain of the routes that Air Excursions intended to serve, including between Anchorage and Dutch Harbor."  (Compl. ¶ 41).

Air Excursions' asserted "injury in fact," on which it claims standing to sue, rests on vague allegations regarding the alleged loss of a business opportunity relating to Air Excursions' initial attempt in early 2021 to implement the plan announced in its July 2020 press release.  (Compl. ¶¶ 42-43).  Air Excursions asserts that it had attempted to negotiate with FLOAT over a possible sublease of the commuter gate space at Anchorage International Airport that had been leased by FLOAT.  (*Id*. ¶ 42).  Air Excursions claims that FLOAT failed to negotiate in "good faith" and that, as a result, no sublease agreement was reached, thereby allegedly preventing Air Excursions from pursuing a charter flight program with a third party that would have allowed Air Excursions to enter the Anchorage-Dutch Harbor passenger air transportation market.  (*Id* ¶¶ 42-43; ECF No. 9-1, Craford Decl. ¶ 9).  Air Excursions does not allege that it had an agreement with that

third party, or that such an agreement was imminent, but only that there had been one "in person" meeting to "discuss the proposed flight program," and that FLOAT's conduct was "in part" responsible for Air Excursions' decision to decline the opportunity.  (ECF No. 9-1, Craford Decl. ¶ 9)

Based on these vague allegations, Air Excursions asserts that "Treasury's actions have enabled FLOAT to prevent Air Excursions from entering the Anchorage-Dutch Harbor passenger air transportation market, causing Air Excursions to sustain an economic injury in fact."  (Compl. ¶ 43).  A similar assertion is made in the declaration of Kent Craford (President of Air Excursions and Kalinin Holdings) filed in support of Air Excursions' motion for preliminary injunction. (ECF No. 9-1, Craford Decl. ¶¶ 2, 10).

However, on August 3, 2021, and omitted from the Craford Declaration, Air Excursions, under its trade name Alaska Seaplanes, publicly announced that it had formed Aleutian Airways and would be providing direct flights from Anchorage to Dutch Harbor beginning in the Fall of 2021.  *See*  Ex. 3  hereto  (https://aleutianair.com/Aleutian-Airways-to-Launch-8-3-21.pdf). Although Craford is identified as the contact for that press release and is quoted in the release (*id.*), his declaration dated August 24, 2021, fails to mention this development.

## STANDARD OF REVIEW

### I.      Rule 12(b)(1) Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance."  *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted).  "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction,"  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. *See, e.g.*, *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011). Thus, the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001).

More specifically, a Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as either a facial or factual challenge. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (a district court may "dispose of a motion to dismiss for lack of subject matter jurisdiction . . . on the complaint standing alone" or "may consider the complaint supplemented by undisputed facts"). "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted).

When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of evidence. *Erby*, 424 F. Supp. 2d at 182.

## II.      Rule 12(b)(6) Standard

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint.  In ruling on a motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet to survive a motion to dismiss under Rule 12(b)(6).  Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555.  The Court stated that while there was no "probability requirement at the pleading stage," *id.* at 556, "something beyond . . . mere possibility . . . must be alleged[.]" *Id*. at 557-58.  The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id*. at 555, or must be sufficient to "state a claim for relief that is plausible on its face," *id*. at 570.

The Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), further clarified the plausibility pleading standard, explaining that this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678.  The plausibility standard "asks for more than a sheer possibility that a defendant acted unlawfully. . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is entitled to relief.'" *Id.*  On a motion to dismiss, under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the complaint, documents either attached to, or incorporated into the complaint by reference, as well as matters of which it

may take judicial notice. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997).[6]

## III.    Preliminary Injunction Standard

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 2018 WL 3232515, at *4 (D.D.C. 2018). The D.C. Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard— "should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Just.*, Civ. A. No. 13-1135 (JEB), 2015 WL 13673371, at *1 (D.D.C. Mar. 12, 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–

---

[6]    Corvus' PSP Application forms and PSP Agreements (Leibenluft Decl. Exhs. 1-6) are incorporated into the Complaint by reference, and may be considered on this motion to dismiss without converting the motion into a motion for summary judgment. (Compl. ¶¶ 14 (PSP1 Application); 21-23, 32-34 (PSP1 Agreement and Bankruptcy Addendum); 38 (PSP2 Application and Agreement); 39 (PSP3 Agreement).

93 (D.C. Cir. 2011), and *Davis*, 571 F.3d at 1292); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*).

Even before *Winter*, courts in the D.C. Circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors."  *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (same).

A movant alleging "speculative injuries" cannot meet the "'high standard for irreparable injury' sufficient to warrant the extraordinary relief of a TRO," and "the Court need not reach the other factors relevant to the issue of injunctive relief."  *United Farm Workers v. Chao*, 593 F. Supp. 2d 166, 171 (D.D.C. 2009); *see Bartko*, 2015 WL 13673371 at *2 ("The Court need not grant injunctive relief 'against something merely feared as liable to occur at some indefinite time'") (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "[T]he movant must demonstrate the injury is of such 'imminence' that there is a clear and present need to equitable relief to prevent irreparable harm."  *Id.*  And "where a party seeks to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet an even higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result."  *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

## ARGUMENT

On July 1, 2021, Air Excursions filed the instant lawsuit against Treasury under the APA, asking that this Court declare unlawful the PSP payments made by Treasury to Corvus under

the CARES Act and subsequent legislation and direct Treasury to claw back those payments.  Air Excursions contends that New Corvus was not a legitimate recipient of payroll assistance under the CARES Act for which Old Corvus had applied because the bankruptcy court order approving the sale of Corvus's assets to FLOAT (under which Corvus resumed operations post-bankruptcy) states that FLOAT was not the "successor" to certain liabilities of the Debtors and also contained a "no merger" clause stating that the buyer (FLOAT) was not a continuation of the Debtors.  Air Excursions asserts that this "no successor" language in the order approving the asset sale meant that New Corvus could not be a "recipient" of payroll support as the term "recipient" is defined in the first Payroll Support Agreement.  That agreement defines the term "recipient" as including "'the Signatory Entity,'" which was Old Corvus, and "its 'successors, and assigns.'"  (Pl. Mot. at 5-9)

Plaintiff contends that that New Corvus was not a "successor" to Old Corvus according to the asset sale order, and thus was not a "recipient" of the payroll support payments made under that first agreement.  (*Id*. at 9).  Plaintiff fails to address the "assigns" language in the definition of "recipient," or other provisions of the PSP Agreement discussed below that render Plaintiff's argument untenable.   Moreover, Plaintiff's argument, however misplaced, is limited to disbursements made under the first PSP Agreement (for which Old Corvus was the signatory) and is wholly inapplicable to disbursements made to New Corvus under the second and third PSP Agreements, in which New Corvus was the signatory.

Even more fundamentally, Plaintiff comes nowhere close to satisfying the demanding standard for preliminary injunctive relief.  Its motion makes no attempt to establish irreparable harm, but instead it asserts, contrary to law, that it meets that distinct element of the preliminary injunction standard if it can establish a likelihood of success on the merits.  (ECF No. 9, Pl. Mot.

at 17)  Thus, for reasons discussed below, the motion for preliminary injunction should be denied and the Complaint dismissed with prejudice.

## I.  Plaintiff Lacks Standing.

Article III of the Constitution requires a plaintiff to "allege[ ] such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citations and quotations omitted).  Built on separation-of-powers principles, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To satisfy the "'irreducible constitutional minimum' of standing" under Article III, a plaintiff must demonstrate that it has: "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision." *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  When, as here, "the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562.  The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* at 561.

Particularly in the context of a preliminary injunction, courts "require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotation marks and citation omitted).  A plaintiff seeking such extraordinary relief, therefore, "cannot rest on mere allegations, but must set

forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Id.* (quoting *Lujan*, 504 U.S. at 561). "[B]ecause standing is a necessary predicate to any exercise of the Court's jurisdiction, the plaintiff and its claims have no likelihood of success on the merits, if the plaintiff lacks standing." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 207 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (citations omitted). Similarly, an absence of standing "dooms the plaintiff's ability to show irreparable harm." *Id.*

### A.   Plaintiff Has Not Alleged That It Has Standing To Challenge Any Payments Under The Second Or Third PSP Agreements.

Standing is "'not dispensed in gross.'" *Davis v. FEC*, 554 U.S. 724, 734 (2008). "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press and 'for each form of relief' that is sought." *Id.* Plaintiff asserts that each decision by Treasury to disburse funds to Corvus constitutes a distinct final agency action that is subject to challenge under the APA. (Compl. ¶ 46). Such disbursements were made under three distinct PSP Agreements pursuant to three separate statutes in roughly equal amounts of approximately $10 million disbursed during the periods of September 2020 to March 2021 (PSP1 Agreement); April 6, 2021 to April 22, 2021 (PSP2 Agreement); and April 23, 2021 to May 27, 2021 (PSP3 Agreement). (Leinbenluft Decl. ¶ 10). Thus, to challenge the disbursements made under each discrete PSP Agreement, Plaintiff must establish that it has standing with respect to that particular disbursement decision.

Plaintiff has made no effort to assert a theory of standing as to the disbursements made under the second and third PSP Agreements, which began in April 2021. Each such payment was made after the alleged injury suffered by Plaintiff in March 2021, when it was unable to secure gate space at the Anchorage airport. Because Plaintiff does not allege that it has suffered any injury as a result of these payments, it lacks standing to pursue claims based on such payments or to require Treasury to claw them back.

**B.    Plaintiff Has Failed To Demonstrate Standing To Challenge Any Payments Under The First PSP Agreement.**

Plaintiff has failed to meet any of the required elements for standing to challenge any payments made under the first PSP Agreement, which were completed by the end of March 2021. As to those payments, Plaintiff attempts to address only the "injury in fact" element in its motion for preliminary injunction and fails to address the other required elements of causation and redressability.  As discussed below, Plaintiff can establish none of these elements.

**1.    Plaintiff Has Failed To Demonstrate An "Injury In Fact."**

Plaintiff has failed to meet its burden of demonstrating an "injury in fact," which requires that Plaintiff adequately plead "an invasion of legally protected interests that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Air Excursions' asserted "harm" is based on vague allegations regarding the alleged loss of a potential business opportunity after Air Excursions attempted in early 2021 to implement a plan to begin air passenger service on the Anchorage-Dutch Harbor route serviced by New Corvus.  (ECF No. 9-1, Craford Decl. ¶ 7)   According to Air Excursions, it had to negotiate with FLOAT to sublease commuter gate space at the Anchorage airport because FLOAT already had leased that gate space.  Air Excursions claims that those negotiations were unsuccessful for reasons that are not specified other than the conclusory assertion that FLOAT failed to negotiate in "good faith." (ECF No. 9-1, Craford Decl. ¶ 8; Compl. ¶ 42)

At the same time, Air Excursions allegedly was in the early stage of discussions with a third party on a proposed charter flight program which, as described by Air Excursions, had not progressed beyond the point of an initial "in person" meeting.  (ECF No. 9-1, Craford Decl. ¶ 9) Air Excursions asserts that it ultimately "had to decline the opportunity, <u>in part</u> because FLOAT's conduct denied Air Excursions the gate space at [the Anchorage airport] that it needed for the

flights." (*Id.*, emphasis added). Air Excursions fails to plead facts that would allow the Court to infer that any agreement with this third party was imminent or had advanced beyond the preliminary discussion stage, and, without such allegations, the alleged loss of business opportunity is entirely conjectural. Accordingly, Air Excursions has failed to establish any injury in fact.

Plaintiff attempts to rely on a "competitive standing" theory to establish injury in fact, but that reliance is misplaced. "The nub of the 'competitive standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing." *El Paso Natural Gas v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995). As explained in *El Paso Natural Gas*, this means that the plaintiff must allege that the agency has authorized a competitor to engage in transactions that are contrary to substantive law and will harm the plaintiff's business. *Id.* at 28. For instance, the D.C. Circuit has found competitive standing in a drug developer's challenge to the FDA permitting a competitor to market a generic version allegedly in violation of a statute that protected the developer of the drug from the competition of generic brands. *Bristol-Myers Squibb Co. v. Shalala,* 91 F.3d 1493, 1499 (D.C. Cir. 1996).

Here, however, there is no allegation that the competitor, New Corvus, "is not legally entitled to serve . . . the customers for which [Air Excursions] hope[s] to compete," and there likewise is no allegation that Treasury has authorized Air Excursions' competitors to engage in allegedly illegal transactions that are competitively harmful to Air Excursions. *El Paso Natural Gas*, 50 F.3d at 28. To the contrary, the record establishes that New Corvus can lawfully service air passengers within the market Air Excursions seeks to enter. Accordingly, as in *El Paso Natural Gas*, Air Excursions cannot establish injury in fact based on the competitive standing doctrine.

Citing *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), Plaintiff appears to contend that it has established competitive standing because the payroll support payments to New Corvus under the first PSP Agreement helped New Corvus financially, thereby enabling it to resume service of its air passenger routes in Alaska and emboldening FLOAT, as its parent, to take a tough negotiating position over the sublease of gate space at the Anchorage airport.   But the mere existence of a competitor lawfully engaged in business is not sufficient to establish competitive standing.  Plaintiff instead must "demonstrate that the regulatory or statutory requirements it seeks to enforce were intended to protect it against such [alleged] competitive injury."  *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 842 (D.C. Cir. 1982).   The payroll support payments authorized by the CARES Act, however, were not designed to regulate competition among air carriers but to minimize airline industry layoffs resulting from the abrupt reduction in air travel caused by onset of the COVID pandemic in the spring of 2020.  CARES Act, 134 Stat. 498 at § 4112 (entitled "Pandemic Relief For Aviation Workers").  The statute's purpose is made clear by the requirement that payroll support funds "shall exclusively be used for the continuation of employee wages, salaries, and benefits."  *Id.*  Those who may fall within the "zone of interest" protected by this provision of the statute, therefore, could include aviation companies seeking such funds, as well as their workers, but not the owners of an airline upset that its competitor was able to financially survive the pandemic and continue to compete.  *See Gull Airborne,* 694 F.2d at 841-42.  Consequently, because Plaintiff's asserted injury was not in the "zone of interests to be protected . . . by the statute," Plaintiff has failed to demonstrate a cognizable injury in fact.  *Id.*; *see also AICPA v. IRS*, No. 16-5256, 2018 U.S. App. LEXIS 22583, at *6 (D.C. Cir. Aug. 14, 2018) ("'The essential inquiry' for the applicable zone of interest 'is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'").

*Mendoza* does not hold otherwise.  In *Mendoza*, the plaintiffs were laborers who claimed procedural injury standing based on a claim that the Department of Labor violated the APA by approving special procedures without notice and comment that allegedly authorized inexpensive foreign labor that competed against them.  754 F.3d at 1007.  At the threshold, Mendoza is thus inapplicable because it concerns standing for a claimed procedural injury, which is not the nature of the claim here.

As the D.C. Circuit recognized, the requirements of standing differ when a plaintiff seeks to enforce procedural, rather than substantive, rights.  *Id.* at 1011.  Once a plaintiff establishes that the agency action "threatens their concrete interest," which can be established by allegations of increased competition or lost opportunity, the standards for "immediacy and redressability are relaxed," and plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different."  *Id.*  Here, Plaintiff has not made a procedural challenge and thus *Mendoza* is inapplicable for that threshold reason.

Although *Mendoza* characterized the competitive standing doctrine as recognizing that parties suffer "'constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition,'" the Court's discussion of the limits of that doctrine ultimately is consistent with that recognized in *El Paso Natural Gas*.  *Id.* at 1011. Specifically, the Court's discussion makes clear that the doctrine necessarily rests on an allegation that an agency has permitted competitors to engage in transactions that are contrary to law, either because the agency is allegedly authorizing conduct by a competitor contrary to substantive law (as in *Bristol-Myers Squibb*, *supra*) or allegedly has promulgated regulations that afford a competitive advantage to one group over another without following the procedures required to promulgate such regulations, which was the allegation in *Mendoza*.  Here, Plaintiff has not alleged

a procedural violation by Treasury, nor has it alleged that Treasury has authorized conduct by a competitor contrary to substantive law that caused it injury within the "zone of interest" protected by the statutory provision authorizing payroll support payments.

> ## 2.      Plaintiff Has Failed To Establish Causation Or Redressability.

Even if the competitive standing doctrine could apply here, that doctrine concerns only the injury-in-fact element of standing and does not speak to the required elements of causation and redressability, which must be separately established. *Mendoza*, 754 F.3d at 1011. Air Excursions has failed to establish causation or redressability, neither of which is addressed in Plaintiff's motion.

To meet its burden on causation, Air Excursions must establish an injury in fact that is "fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. Where, as here, the "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict," standing is "substantially more difficult to establish." *Id*. at 562 (quotations omitted). Plaintiff fails to explain how the negotiating position of FLOAT on the issue of gate space in March 2021, which Plaintiff identifies as the reason (at least "in part") for its inability to enter that particular air passenger market at that time, is traceable to the approximately $5 million in payroll support payments that had been made to New Corvus before that month or the additional $5 million that was paid during the month of March. Plaintiff has not alleged when the gate space had been leased to FLOAT (*i.e.*, whether it was before or after Treasury's disbursement to New Corvus), and thus has alleged no connection between FLOAT's acquisition of that lease and Treasury's

disbursement of payment support payments to New Corvus.  Nor has Plaintiff pled facts demonstrating any connection between FLOAT's negotiating position and New Corvus's receipt of those payments.

Air Excursions appears to suggest that FLOAT was emboldened to take a tough negotiating stance on a sublease arrangement because of those payments to its subsidiary, but has pled no facts that would support an inference that FLOAT would have taken a different negotiating position without such payments.  *See Nguyen v. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 36 (D.D.C. 2020) (immigrant plaintiffs failed to demonstrate that an order preventing the enforcement of a Presidential Proclamation would redress their injuries, because the COVID pandemic had already resulted in the worldwide suspension of visa services).  According to Plaintiff's own allegations, FLOAT had leased all of the commuter gates at the airport, which by itself would have given it leverage in any such negotiation.  And, although Plaintiff characterizes FLOAT's negotiating position as lacking "good faith" (Compl. ¶ 42), that subjective assertion is entirely conclusory and ultimately insufficient.  Such allegations establish that Plaintiff's asserted harm is the result of independent action by a third party (FLOAT) that is not before the Court, rather than the challenged conduct of the Treasury Department.  Accordingly, Plaintiff has failed to establish the causation requirement for standing.

Finally, for similar reasons, Air Excursions has failed to establish redressability, the idea that the injury alleged can be redressed by a favorable decision.  *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) ("Redressability examines whether the relief sought . . . will likely alleviate the particularized injury alleged by the plaintiff.").  Stated plainly, a Court ordering the Treasury Department to claw back the first round of Payroll Support Program payments made to New Corvus would not require FLOAT to change its negotiating position with respect to

subleasing gate space.  Plaintiff's assertion that a clawback "would likely cause FLOAT to curtail its anticompetitive conduct" (Compl. ¶ 44) is entirely conclusory and unsupported by Air Excursions' limited allegations. *See Nguyen*, 460 F. Supp. 3d at 36 ("Simply put, the court cannot remedy an injury that is not caused by the challenged action before it.").

For example, in *C-SPAN v. FCC*, various cable programmers challenged an FCC regulation that required cable operators to carry certain broadcast network TV channels.  545 F.3d 1051 (D.C. Cir. 2008).  The plaintiffs alleged that cable operators would therefore "have less bandwidth to fill and [could] thus afford to drive harder bargains with potential suppliers." *Id*. at 1054-55.  The D.C. Circuit noted that cable operators had many choices about how to allocate their bandwidth capacity and held that the plaintiffs had failed to "adduce facts showing" that they would be the recipients of that additional bandwidth capacity if the regulation was struck down. *Id*. at 1057. Accordingly, their showing of redressability was speculative, which required dismissal. *Id*.

So too here.  Plaintiff has adduced no facts showing that it will be the recipient of a fairly priced sublease of commuter gate space at the Anchorage airport if Treasury claws back funds from New Corvus.  Perhaps New Corvus (or FLOAT) has a balance sheet that could absorb the repayment of some of its PSP funds to Treasury, or perhaps New Corvus (or FLOAT) could raise capital or sell assets to repay Treasury.  If FLOAT decided to raise funds by subleasing its Anchorage gate space, perhaps it would sublease that gate space to other market participants rather than Air Excursions (which seeks to compete with New Corvus over identical routes).  Or perhaps FLOAT would bargain in good faith with Air Excursions to sublease the gate space, but the parties still would not be able to reach an agreement for any number of reasons.  In any event, Plaintiff's allegation that clawing back the first round of PSP funds "upon information and belief, would

likely cause FLOAT to curtail its anticompetitive conduct," (ECF No. 9-1, Craford Decl. ¶ 11), is entirely speculative.

Regardless, according to the August 3, 2021 press release announcing direct flights between Anchorage and Dutch Harbor, Air Excursions appears to have successfully arranged for gate space at the Anchorage airport. Accordingly, Plaintiff appears to have entered this market without need of the relief it requests in this lawsuit. (Ex. 3 hereto).

## II. The Terms And Conditions Of Treasury's Payroll Support Disbursements Were Committed To Agency Discretion And Are Not Justiciable Under The APA.

The APA generally authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. When APA review is available, a court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

"[B]efore any review at all may be had," however, "a party must first clear the hurdle of § 701(a)," *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes review under the APA if the challenged agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[7]

---

[7]    The D.C. Circuit has observed that the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide 'a limited cause of action for parties adversely affected by agency action,'" but do not operate as a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009); *but see Goodwin v. Sec'y of HUD*, 356 F.3d 310, 312-13 (D.C. Cir. 2004) (holding that the availability of an alternative remedy deprived the Court of jurisdiction for a claim under the APA); *Baltimore Gas & Elec. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001) (no jurisdiction over challenge to FERC's discretionary decision to settle an enforcement action rather than to see it "through to fruition"); *see also Citizens for Responsibility & Ethics in Washington v. DOJ*, 164 F. Supp. 3d 145, 150 (D.D.C. 2016) (noting "a dispute among the courts of this District as to whether the argument Defendants make here—FOIA offers an alternative remedy and thus precludes a claim under the APA—should be reviewed under Rule 12(b)(6) for failure to state a claim or under Rule 12(b)(1) for lack of subject matter jurisdiction"). Consequently, Rule 12(b)(1) is cited as an alternative basis for dismissal.

Action is committed to agency discretion if it is of the kind "traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citing *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993)), or "an agency's decision not to institute enforcement proceedings," *Lincoln*, 508 U.S. at 191. Section 701(a)(2) also precludes review if the statute underlying a plaintiff's challenge "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln,* 508 U.S. at 191.  As one court has explained,

> There is "no law to apply" when there are no "substantive legal criteria against which an agency's conduct can be seriously evaluated." *Drake v. F.A.A.,* 351 U.S. App. D.C. 409, 291 F.3d 59, 70 (D.C. Cir. 2002). Thus, when a statute provides an agency with such broad decision-making powers that no "concrete limitations . . . on the agency's exercise of discretion" or "'judicially manageable standards' are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts." *Id.* at 70.

*Wendland v. Gutierrez*, 580 F. Supp. 2d 151, 153 (D.D.C. 2008).   In sum, the exception to judicial review for agency "action committed to agency discretion" applies to agency decisions that either (1) fall into "certain categories of administrative decisions that . . . [are] committed to agency discretion," such as "a decision not to institute enforcement proceedings" or to "allocat[e] . . . funds from a lump-sum" or (2) arise from a statute that "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (internal quotation marks omitted).

Here, given the emergency nature of the CARES Act legislation and the expedited timeframe for its implementation, Congress delegated considerable discretion to the Secretary in administering payroll support payments, providing that "[f]inancial assistance provided to an air carrier or contractor under this subtitle shall be in such form, on such terms and conditions . . . as the Secretary determines appropriate."   CARES Act, 134 Stat. 281 at § 4113(b)(1)(A).   As

discussed below, that degree of discretion – essentially what the Secretary deems appropriate – "foreclose[s] the application of any meaningful judicial standard of review" and precludes an APA claim under section 701(a).  *Webster v. Doe,* 486 U.S. 592, 600 (1988) (statute allowing termination "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States'" is a standard that "fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review"); *see also Drake v. FAA,* 291 F.3d 59, 72 (D.C. Cir. 2002), *cert. denied,* 537 U.S. 1193 (2003) (statute establishing a subjective standard of what "the agency thinks" about a particular issue is not subject to APA review); *CC Distributors, Inc. v. United States*, 883 F.2d 146, 153-54 (D.C. Cir. 1989) (where statute left to Secretary of Defense to "determine" what functions could be performed by contractors versus military or government personnel, APA review was not available).[8]

As an initial matter, the only constraint that the CARES Act placed on the Secretary's discretion in determining eligibility for payments was the statutorily imposed requirement that the recipient be an air carrier.  *See* 134 Stat. 281 at § 4111; 49 U.S.C. § 40102(a)(2) ("'[A]ir carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation.").  Corvus indisputably is an air carrier, and that acknowledged fact

---

[8]     Plaintiff's theory as articulated in its preliminary injunction motion is that New Corvus was not a proper recipient of disbursements made under the first PSP Agreement pursuant to the CARES Act because Old Corvus was the signatory on that agreement and New Corvus was not a "successor" to Old Corvus in Plaintiff's view.  Plaintiff, however, has offered no theory as to why New Corvus was not a proper recipient of payroll support payments under the second and third PSP Agreements that New Corvus signed pursuant to the Consolidated Appropriations Act, 2021, and American Rescue Plan Act of 2021.  Further, the same degree of discretion over the terms and conditions of payroll support disbursements afforded the Treasury Secretary under the CARES Act was afforded to the Secretary under those statutes.  *See* 134 Stat. 1182 at § 403(b)(1)(A); 135 Stat. 4 at § 7301(b)(3-4).  Thus, on the issue of agency discretion, the analysis remains the same without regard to the statute under which the disbursement was made.

distinguishes this case from *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 456 F. Supp. 3d 152 (D.D.C. 2020), on which Plaintiff relies.  That case concerned a different provision of the CARES Act that afforded financial assistance to "Tribal governments," a term defined in the statute. *See* 134 Stat. 281 at § 5001.  The question before the Court in that case was whether the recipient constituted a "Tribal government" within the meaning of the statute.  *Id*. at 165-66. That statutorily imposed requirement for eligibility limited the Secretary's discretion and provided a standard by which the Court could review whether the recipient met that definition.  *Id.* at 161 (Congress "circumscribed the agency's discretion by supplying a concrete definition of 'Tribal government' against which to measure eligibility for Title V funds and, correspondingly, for the court to conduct judicial review.").

Here, in contrast, the question is whether Corvus – an eligible air carrier under the statute – satisfies the terms and conditions for payment that were established by the Secretary through an exercise of broad discretion authorized by the statute.  Following enactment of the CARES Act, Treasury promulgated a standard form to be used by applicants seeking PSP payments, which set forth the application procedures pursuant to section 4113(b)(1) of the CARES Act.  (Leibenluft Decl. ¶ 3 and Ex. 1).  Consistent with the considerable discretion afforded the Secretary under that Act, the form provides that "[t]hese procedures may be updated, revised, or modified at any time, and the requirements contained herein may be waived by the Secretary of the Treasury in his sole discretion to the extent permitted by law."  (*Id*., Ex. 1 at 1).

Treasury also set forth the terms and conditions for disbursement in the standard form PSP contracts that were signed before disbursements were made.  Although the PSP Agreement contains defined terms, including the term "recipient," which is the focus of the Complaint, it also provides that the definitions set forth in the Agreement are not to be rigidly applied when "the

context clearly requires otherwise," thus affording Treasury discretion to consider the relevant "context" in applying those terms.  (Ex. 2 to Leibenluft Decl. at 2).

The PSP Agreement contains a series of provisions underscoring the breadth of Treasury's discretion in implementing the program.  The agreement "shall be construed in a manner consistent with any public guidance Treasury may from time to time issue regarding the implementation of the" Payroll Support Program; with respect to payments under the agreement, "the amounts (individually and in the aggregate) and timing of such payments will be determined by the Secretary in his sole discretion"; under the agreement, "[t]he Secretary may, in his sole discretion, increase or reduce the" amount a company receives "consistent with section 4113(a) of the CARES Act" and to address any shortfall of funds; and "Treasury may, in its sole discretion, waive any term or condition under this Agreement imposing a requirement on the Recipient or any Affiliate."  (Ex. 2 to Leinbeluft Decl. at p. 2 and ¶¶ 2, 47).  These same provisions appear in the second and third PSP agreements as well.  (Ex. 5 to Leibenluft Decl. at p. 2 and ¶¶ 2, 47; Ex. 6 to Leibenluft Decl. at p. 2 and ¶¶ 2, 47).

Finally, the Secretary also was given wide discretion in section 4113(b)(1) of the CARES Act over the terms and conditions for the clawback of any disbursed funds.  *See* CARES Act, 134 Stat. 281 at § 4113(b)(1)(A).  The statute provides that "[f]inancial assistance provided to an air carrier or contractor under this subtitle shall be . . . on such terms and conditions . . . *including requirements for audits and the clawback of any financial assistance* . . . as the Secretary determines appropriate."  *Id*.  (emphasis added)

In the exercise of the considerable discretion granted by Congress, Treasury included a remedy section in its standard form PSP agreement that could be invoked by Treasury in its discretion in the event Treasury "believes" that an instance of noncompliance has occurred.  (Ex.

2 to Leinbeluft Decl. at ¶ 22).   The remedy section further provided that, in the event Treasury determines that an instance of noncompliance has occurred, Treasury "may, in its sole discretion," elect from various remedial options, including to "withhold any Additional Payroll Support Payments; require the repayment of the amount of any previously disbursed Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate this Agreement; or take any such other action as Treasury, in its sole discretion, deems appropriate."   (*Id.* at ¶ 23).   Such a provision appears in the first PSP Agreement (*id.*), as well as the other PSP Agreements at issue.   (Ex. 5 to Leibenluft Decl. at ¶¶ 22-23; Ex. 6 to Leibenluft Decl. at ¶¶ 22-23).   The Secretary has made no determination that Corvus – the PSP recipient that is the focus of this lawsuit – failed to comply with the terms and conditions of the PSP assistance that it received.   (Leibenluft Decl. ¶ 13).

Thus, even if *arguendo* Plaintiff has standing, its APA claim fails on the merits at the threshold for two reasons.   First, the Secretary of the Treasury had discretion to interpret the terms "successors" and "assigns" as used in the definition of "recipient" in the PSP Agreement as broadly as it deemed the context to require.   The bankruptcy court issued its order approving the Asset Purchase Agreement with the understanding that the funds to be provided under the first PSP Agreement would be disbursed to the purchaser of Old Corvus's capital stock and assets.   Indeed, Old Corvus so advised the bankruptcy court when it sought permission from the bankruptcy court to execute the first PSP Agreement.   (Case No. 20-10755, ECF No. 377 at 6, 8).   And FLOAT acquired all of the capital stock of Old Corvus in connection with the Asset Purchase Agreement.   Consequently, Treasury had discretion to consider this context in interpreting the terms "successors" and "assigns" as used in the definition of "recipient" under the PSP Agreement and

thus to interpret those terms as encompassing New Corvus.  Treasury also had discretion under the express terms of the PSP Agreement to waive any alleged limitation imposed by that definition.

Second, the Secretary retains the sole discretion under the PSP Agreement to determine whether a recipient is in noncompliance and, if so, whether to invoke a clawback remedy or any other remedy for any such noncompliance.  Congress did not mandate a clawback remedy in the CARES Act, or establish any terms or conditions for invoking such a remedy, but left all such matters to the Secretary's discretion.  In exercising that discretion, the Secretary included a clawback remedy in the standard PSP Agreement, but specified that whether to invoke that remedy, a different remedy, or no remedy at all for noncompliance fell exclusively within the Secretary's discretion.

It is well established that, absent some specific statutory limitation on an agency's enforcement discretion, the decision whether to institute an enforcement action is committed to the agency's discretion by law and is therefore unreviewable.  *Chaney*, 470 U.S. at 838.  Indeed, as the D.C. Circuit has observed, "*Chaney*'s recognition that the courts must not require agencies to initiate enforcement actions may well be a requirement of the separation of powers commanded by our Constitution.  The power to take care that the laws be faithfully executed is entrusted to the executive branch -- and only to the executive branch. . . .  One aspect of that power is the prerogative to decline to enforce a law, or to enforce a law in a particular way." *Baltimore Gas & Elec.*, 252 F.3d at 459.

Courts, therefore, presumptively lack jurisdiction over challenges to an agency's discretionary determination to "decline to enforce a law, or enforce a law in a particular way" instead of a plaintiff's preferred way.  *See id*. at 461.  It is settled that a court cannot usurp such a discretionary determination and order an agency to "enforce a law in a particular way," which is

effectively what Plaintiff seeks here.  For that additional reason, Plaintiff's claim is precluded by section 701(a) of the APA.

## III.   Plaintiff Has Failed To State A Claim.

Apart from the issue of agency discretion, Plaintiff has failed to plausibly plead a violation of the APA for two additional reasons.  As discussed above, Plaintiff's theory that New Corvus was an improper recipient of payroll support payments is premised on the contention that New Corvus was not a "successor" to Old Corvus and thus no "recipient" as that term was defined in the first PSP Agreement.  Plaintiff relies on the "no successor" language in the bankruptcy court's order approving the asset sale, but, as a review of that order and the record before the bankruptcy court reflects, the cited language addressed the issue of liabilities and was not intended to invalidate the transfer of PSP rights contemplated in the Asset Purchase Agreement that was the subject of the order.

In other words, Plaintiff's overly broad reading of the "no successor" language that it cherry-picks from the asset sale order is not a reasonable interpretation of the order because the purpose of the order was to approve a sale of assets that included the transfer of PSP rights to the purchaser, which was a condition of the purchaser's bid and a condition precedent of the asset sale approved by the bankruptcy court in the asset sale order. (Case No. 20-10755, ECF No. 434-1; *id*. ECF No. 492-1, Asset Purchase Agreement § 7.2(e)).  Air Excursions' interpretation would lead to the absurd result of the bankruptcy court negating by its asset sale order a material aspect of the asset sale (the transfer of rights to CARES Act disbursements) that the order was approving.

Second, Plaintiff's argument ignores that the definition of the term "recipient" is not limited to "successors" of Old Corvus but also includes its "assigns" and, in that regard, the Asset Purchase Agreement that was approved by the bankruptcy court states that the PSP Agreement

31

executed in July 2020 was being assigned to FLOAT, with disbursements to be made to New Corvus.  (Case No. 20-10755, ECF No. 492-1 at § 5.6(e) and § 7.2(e))  Section 5.6(e) of the Asset Purchase Agreement, for instance, states that "Seller and Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other through Closing in connection with Buyer's efforts to obtain the Department of Treasury approval of the assignment to Buyer of the PSP Agreement and disbursement of the PSP Funds to Corvus."  (*Id*.)  And section 7.2(e) makes the approval by the Department of Treasury of the "assignment to Buyer of the PSP Agreement" a condition precedent of the asset sale.  (*Id*.)

Although the limited record currently before the Court does not reflect a written approval of this assignment by Treasury, the Asset Purchase Agreement did not require that any such approval be in writing and Treasury's disbursement of the funds to New Corvus reflects an approval of the assignment by implication.  Plaintiff, in any event, has failed to plead that New Corvus was not an assignee of the rights to the payroll support payments, and the Asset Purchase Agreement which is incorporated by reference into the Complaint reflects that it was. Consequently, Plaintiff has failed to plausibly plead that New Corvus was not a "recipient" under the Payroll Support Agreement by virtue of the assignment language in the Asset Purchase Agreement and, therefore, has failed to state a claim for this additional reason.

Finally, Plaintiff's theory fails to address the disbursements made to New Corvus under the second and third PSP agreements.  Under those agreements, the signatory was New Corvus and, as such, New Corvus met the definition of "recipient" as it was the "Signatory Entity." [9]

---

[9]     Lastly, although Plaintiff brings APA claims, Defendant should be excused from any requirement of Local Civil Rule 7(n) to produce an administrative record with the filing of this dispositive motion.   The production of an administrative record at this stage is unnecessary— Defendant seeks to dismiss this case not based on an administrative record, but instead based on

IV.     **Plaintiff Has Failed To Meet Its Burden For Preliminary Injunctive Relief.**

    **A. Plaintiff Has Failed To Demonstrate A Likelihood Of Success On The Merits.**

As the above discussion establishes, Plaintiff lacks standing to assert a claim against Treasury under the APA with respect to disbursements made to another air carrier under the CARES Act and subsequent legislation.   In addition, the terms and conditions of such disbursements are matters within Treasury's sole discretion, including whether to waive any specific terms and conditions in a particular case, as well as what remedy to invoke (if any) in the event Treasury determines in its discretion that a recipient of payroll support funds is not in compliance.   Finally, apart from the issue of agency discretion, Plaintiff has failed to plausibly plead a violation of any statute, regulation, or provision of the PSP Agreement and, therefore, has failed to state a claim.   Accordingly, Plaintiff has failed to demonstrate a likelihood of success on the merits to support its claim for preliminary injunctive relief.

    **B. Plaintiff Has Not Demonstrated That It Will Suffer Irreparable Harm, And The Balance Of Equities Favors Defendants.**

"Regardless of how the other three factors are analyzed, it is required that the movant demonstrate an irreparable injury." *Mdewakanton Sioux Indians of Minnesota*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017) (footnote omitted).   "The basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *see also CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).   The Supreme Court's "frequently reiterated standard requires Petitioners seeking preliminary relief to demonstrate that

---

the absence of jurisdiction and a failure to state a cognizable claim.  *See, e.g.*, *Connecticut v. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (granting the government's motion to waive compliance with Local Civil Rule 7(n) because the court did not need to consider the administrative record in deciding the government's motion to dismiss) (citing cases).

irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).   Moreover, conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm.  *Henke*, 842 F. Supp. 2d at 59.   "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *see also Wisc. Gas,* 758 F.2d at 674 (mere speculation is not sufficient to establish irreparable harm); *Bartko*, 2015 WL 13673371 at *2 ("The Court need not grant injunctive relief 'against something merely feared as liable to occur at some indefinite time.'"); *Farris,* 453 F. Supp. 2d at 78 (higher standard applies when the moving party seeks to alter the status quo, rather than preserve it:  the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result.")   Plaintiff has failed to make this showing.

Plaintiff makes no attempt to allege any irreparable injury and, indeed, its recent entry into the air passenger market that is being serviced by Corvus would preclude any such assertion. Instead, Plaintiff asserts that "[b]y establishing its right to relief under the APA, Air Excursions has met its burden of proof with respect to the irreparable injury element of the test for preliminary injunctive relief."  (ECF No. 9, Pl. Mot. at 17).  Plaintiff, however, has failed to establish a right to relief under the APA and, in any event, the irreparable harm requirement for preliminary injunctive relief is independent of a showing of a likelihood of success on the merits.  Nor has plaintiff shown or cited authority establishing that a mere allegation of any asserted arbitrary or capricious action is sufficient to establish an irreparable injury. Plaintiff's contention would effectively read the irreparable injury requirement out of any APA action.  Consequently,

Plaintiff's motion should be denied for failure to establish irreparable injury in the absence of the relief requested.

Finally, the balance of equities weighs against issuing a preliminary injunction.  While Plaintiff asserts that New Corvus is impeding competition in the Alaskan air passenger market, Plaintiff is not bringing antitrust or unfair competition claims against the party that it claims is actually causing it harm.  Instead, Plaintiff requests an injunction to impose financial harm upon New Corvus in the hopes that doing so will provide Plaintiff leverage in potential future business negotiations.  Treasury provided payroll support payments to air carriers and contractors—including New Corvus, Air Excursions, and Kalinin Aviation—in an attempt to keep aviation workers employed despite the impact of the COVID-19 pandemic on the domestic aviation industry.  It is not in the public interest to claw back funds from one of these entities in order to provide a competitive business advantage to another, a factor that further weighs against Plaintiff's request for preliminary injunctive relief.

## CONCLUSION

For reasons stated above, the Court should deny Plaintiff's request for a preliminary injunction and dismiss the Complaint with prejudice.

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. BAR #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.

Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendant