**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AIR EXCURSIONS, LLC.,** | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-01769 (TNM) |
| **JANET YELLEN**, *in her official capacity as Secretary of the Treasury*, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

COVID-19 created challenges for many businesses.  In response, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  The Act provided billions of dollars for various industries, including air carriers.  Two further Congressional acts provided even more.  Corvus Airlines was one of the beneficiaries.  But before the Department of the Treasury could disburse the money to Corvus, the airline filed for bankruptcy.  A new company, FLOAT Shuttle, bought some of Corvus's assets, including the right to its federal relief payments.  FLOAT then began flying routes in Alaska formerly serviced by Corvus.

Plaintiff Air Excursions had planned to serve those routes, too, but it claims FLOAT impeded its entry into the market by charging below-market fares enabled by the federal subsidies.  It sues to force the Treasury to claw back those payments as contrary to the Administrative Procedure Act (APA).  The Treasury argues Air Excursions lacks standing and fails to state a claim.  The Court finds Air Excursions has standing but agrees it fails to state a claim.  The governing statutes contain no judicially manageable standard of review, and even if they did, Air Excursions relies heavily on a bankruptcy court order that it misconstrues.  The Court will grant the Treasury's motion to dismiss.

**I.**

Congress passed the CARES Act at the beginning of the pandemic.  *See* First Am. Compl. (Compl.) ¶ 8, ECF No. 13.  The Act provided $25 billion for air carriers to "exclusively be used for the continuation of payment of employee wages, salaries, and benefits."  *Id*. (quoting 15 U.S.C. § 9072(a)).  The Act granted the Treasury discretion to decide how to distribute the funds:

> Financial assistance provided to an air carrier or contractor . . . shall be in such form, on such terms and conditions (including requirements for audits and the clawback of any financial assistance provided upon failure by a passenger air carrier, cargo air carrier, or contractor to honor [the required assurances]), as the Secretary determines appropriate.

15 U.S.C. § 9073(b)(1)(A).

At the end of 2020, Congress passed another relief package.  The Consolidated Appropriations Act of 2021 (CAA) authorized $15 billion in payroll support for passenger air carriers.  *See id*. § 9092(a).  In early 2021, Congress passed the third relief package at issue.  The American Rescue Plan Act of 2021 (ARP) provided $14 billion in payroll support for passenger air carriers.  *See id*. § 9141(b).  Both the CAA and the ARP incorporated the CARES Act's grant of discretion to the Treasury.  *See id.* § 9093(b)(1)(A) (CAA); *id.* § 9141(b)(3)(A) (ARP).  The Treasury disbursed the funds from all three of these statutes through the Payroll Support Program (PSP).

Corvus was one of many air carriers to apply for PSP payments.[1]  *See* Compl. ¶¶ 12–14. Only two days after it applied for these payments, it filed a voluntary petition for relief under

---

[1]  Air Excursions also benefited from this federal largess.  It applied for PSP payments and received $250,000.  Mot. to Dismiss at 7 n.2, ECF No. 17.  A partner airline, which operates Alaska Seaplanes with Air Excursions, received $6 million.  *Id.*

Chapter 11 of the Bankruptcy Code.  *Id.* ¶ 15.  While the bankruptcy proceedings were pending, the Treasury sent Corvus a PSP Agreement to execute.  *Id.* ¶ 19.  Corvus filed an emergency motion seeking permission to enter into the PSP Agreement.  *Id.* ¶ 20.  The bankruptcy court granted the motion.  *Id.* ¶ 25.

The court then approved a Chapter 11 liquidation plan.  *Id.* ¶ 27.  Rather than reorganize to continue operations, Corvus opted to sell its assets and cease flying.  *Id.* ¶ 28.  FLOAT bought some of Corvus's assets.  *Id.* ¶ 29.  Along with buying several aircraft and all of Corvus's capital stock, FLOAT bought "all right, title, and interest of the Seller in and to any and all federal loans, grants, subsidies, or other forms of funding . . . including, without limitation, to monies or rights to monies pursuant to the [CARES Act]."[2]  *Id.* ¶ 32.  In approving the Asset Purchase Agreement governing the sale, the bankruptcy court wrote that the "[b]uyer shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity."  Sale Order ¶ 32, ECF No. 13-1.

In the summer of 2020, the Treasury disbursed $10,297,313 to New Corvus, although the actual beneficiary was FLOAT.[3]  Compl. ¶¶ 37–38.  Air Excursions maintains the Treasury made this disbursement in error because it did not understand Old Corvus's sale.  It notes that the PSP Agreement governing this disbursement specified Old Corvus as the "Recipient."  *Id.* ¶ 21.

---

[2]  Although Corvus ceased operations upon the conclusion of the bankruptcy proceedings, the proceedings did not extinguish Corvus as a corporate entity.  *See* Compl. ¶¶ 35, 39.  Corvus remains a Washington corporation—even though FLOAT owns many of its assets and all its capital stock.  *Id.* ¶ 39.  To distinguish between Corvus before and after the proceedings, the Court will refer to Corvus before the proceedings as "Old Corvus" and Corvus after the proceedings as "New Corvus."

[3]  Old Corvus signed the first PSP Agreement, but by the time the Treasury disbursed the funds, the parties to the bankruptcy proceeding had completed the sale.  *See* Compl. ¶¶ 35, 37.  Thus, the Treasury gave the funds to *New* Corvus and FLOAT benefitted because it owned New Corvus's capital stock and the right to its PSP payments.  *Id.* ¶¶ 32, 37–38.

The Agreement defined "Recipient" as the "signatory entity" and its "successors" and "assigns." *Id.* ¶ 22.  The Recipient could not assign the PSP funds to another entity without the Treasury's express written permission.  *Id.* ¶ 23.  No written permission appears in the record.  *Id.* ¶ 36. Thus, says Air Excursions, the funds had to go to Old Corvus or its successor.  Because the bankruptcy court found that the buyer was not a "successor" to Old Corvus, FLOAT was not entitled to the funds as a successor.  *Id.* ¶¶ 38–39.  The only conclusion, Air Excursions maintains, is that FLOAT received the funds by mistake.

FLOAT purportedly compounded this error when it applied for PSP funds under the CAA and claimed it was the same entity that applied for PSP funds under the CARES Act.  *Id.* ¶ 42.  The Treasury gave FLOAT $10,478,223 under the CAA.  *Id.*  When Congress passed the ARP, FLOAT sought PSP funds under that program, too.  *Id.* ¶ 43.  The Treasury based FLOAT's eligibility for those funds on its eligibility for the CAA funds.  *Id.*  It gave FLOAT $9,773,038 under the ARP.  *Id.*

FLOAT began operating in the Anchorage-Southwest Alaska passenger air transport market in the fall of 2020 and charged below-market fares.  *Id.* ¶¶ 46–47.  Air Excursions planned to operate in this same market and has been accepting reservations for several routes. *Id.* ¶ 52.  It claims that FLOAT's below-market fares, made possible by the PSP payments, are anticompetitive and impede its ability to enter the market.  *Id.*

It also claims that it approached FLOAT about subleasing terminals at Ted Stevens Anchorage International Airport (ANC).  *Id.* ¶ 48.  FLOAT had leased all the commuter aircraft gates at ANC, although Air Excursions alleges FLOAT was using only half of them.  *Id.* Because FLOAT "refused to negotiate in good faith," the parties did not reach a sublease agreement and Air Excursions lost a business opportunity.  *Id.* ¶¶ 48–49.

Seeking to halt FLOAT's allegedly anticompetitive conduct, Air Excursions sued.  It seeks a declaratory judgment that the Treasury violated the APA by acting arbitrarily and capriciously when it disbursed funds to an ineligible recipient, FLOAT, in violation of the PSP statutes and the three PSP Agreements—one for each disbursement.  Compl. at 16.[4]  It also seeks injunctive relief directing the Treasury to claw back the payments and refrain from any more disbursements to FLOAT.  *Id.*  The Treasury moves to dismiss, arguing that Air Excursions lacks standing and fails to state a claim.  *See* Mot. to Dismiss, ECF No. 17.  The motion is now ripe.[5]

## II.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hurd v. Dist. of Colum.*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts the complaint's factual allegations as true and grants the plaintiff "all inferences that can be derived from the facts alleged."  *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

The Court need not, however, credit "a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (cleaned up).  The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice."  *Hurd*, 864 F.3d at 678 (cleaned up).  Evaluating a motion to dismiss requires a "reviewing court to draw on its judicial experience and common sense."

---

[4]  All page numbers refer to the pagination generated by the Court's CM/ECF system.

[5]  Because the Complaint brings claims under federal statutes, the Court possesses federal question jurisdiction.  *See* 28 U.S.C. § 1331; *see also* Compl. ¶ 6 (asserting the Court has jurisdiction under § 1331).

*Freedom Watch, Inc. v. Google, Inc.,* 368 F. Supp. 3d 30, 36 (D.D.C. 2019), *aff'd,* 816 F. App'x 497 (D.C. Cir. 2020).

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[D]istrict courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but instead operate as appellate courts resolving legal questions." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The APA also provides that a reviewing court must set aside agency action if the agency has acted "without observance of procedure required by law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(D), (C).

## III.

## A.

To establish standing, Air Excursions must allege:  (1) that it has suffered an injury in fact that is both concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the Treasury; and (3) that a favorable decision is likely to redress the identified harm.  *See Sabre, Inc. v. DOT*, 429 F.3d 1113, 1117 (D.C. Cir. 2005). Because Air Excursions alleges so-called competitor standing, it must show "that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *KERM, Inc. v. F.C.C.*, 353 F.3d 57, 60 (D.C. Cir. 2004) (cleaned up). Finally, Air Excursions must "demonstrate that the regulatory or statutory requirements it seeks to enforce were intended to protect it against such competitive injury." *Gull Airborne Instrus., Inc. v. Weinberger*, 694 F.2d 838, 842 (D.C. Cir. 1982).

Start with injury.  Under the competitor standing doctrine, "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010).  Air Excursions alleges the Treasury allowed increased competition against it by improperly distributing funds to Corvus.  *See* Compl. ¶¶ 37–44.  These payments enabled Corvus to charge below-market fares starting in November 2020 and continuing to the present.  *Id.* ¶¶ 46–47.  More, the funds empowered Corvus to rebuff Air Excursion's attempt to sub-lease gate space at ANC.  *Id.* ¶¶ 48–50.  The lack of gate space was a "significant factor" in Air Excursion losing a "valuable business opportunity" in 2021.  *Id.* ¶ 49.

The Treasury responds that even if the payments allowed Corvus to charge below-market fares, Air Excursions is still poised to enter the market.  *See* Mot. to Dismiss at 20.  So Air Excursions suffered no injury.  *See id.*  And Air Excursion's argument about lack of gate space fails to confer standing, says the Treasury, because by its own admission it had not engaged in more than "an initial in-person meeting" for the lost business opportunity.  *Id.* at 19.  The loss of that opportunity is thus "entirely conjectural."  *Id.* at 20.  Even if that opportunity could confer standing, the Treasury argues it can only do so for the first PSP payment because the second and third PSP payments occurred after FLOAT refused to sub-lease gate space.  *Id.*

The Treasury overstates Air Excursions' burden.  Although Air Excursions must be a "direct and current competitor whose bottom line may be adversely affected by the challenged government action," *PSSI Glob. Servs., L.L.C. v. Fed. Commc'ns Comm'n*, 983 F.3d 1, 11 (D.C. Cir. 2020) (cleaned up), the Circuit interprets this standard generously.  For example, in *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), a group of herders challenged a Department of Labor regulation governing their working conditions and wages.  *Id.* at 1007.  They argued

Labor's regulation ensured a stream of foreign workers and that the availability of foreign workers encouraged employers to offer substandard conditions and wages. *Id.* Labor challenged the herders' competitive standing because they had not worked in the herding industry for several years. *Id.* The district court held the herders lacked standing. *Id.* at 1012.

But the Circuit reversed because the district court had taken "too narrow a view of what qualifies as participating in the herding labor market." *Id.* The Circuit found it sufficient that the herders "monitored the labor market for acceptable positions" and that an employer had offered at least one of the herders a job that he had declined because of the wages and conditions. *Id.* at 1013–14. This "informal involvement" in the labor market was adequate because the herders "retained ties to the industry" and it was "reasonable for them to conclude that formally applying for jobs would be futile when they would not accept a job offering the prevailing wage and working conditions." *Id.* at 1014.

Air Excursions' involvement in the Alaska air-transportation market exceeds the herders' involvement in the herding market. Air Excursions announced in the summer of 2020 it intended to service routes Old Corvus had served. *See* Compl. ¶ 45. In March 2021, Air Excursions tried to obtain gate space at ANC. *Id.* ¶ 48. It has been accepting charter reservations and intends to begin service this year. *See* Pl.'s Opp'n to Mot. to Dismiss at 14 (Pl.'s Opp'n), ECF No. 20.

True, Air Excursions is moving ahead with its plans to enter the market despite FLOAT receiving the PSP payments. But Air Excursions could reasonably seek to enter the market even if FLOAT is charging below-market fares. Perhaps Air Excursions hopes to build brand

awareness.  Or perhaps the routes are still profitable but not as profitable as they would be if

FLOAT were not charging below-market fares.  Either way, the Treasury's payments injured it.[6]

Consider causation and redressability next.  The Treasury argues Air Excursions does not

adequately tie the PSP payments to FLOAT's low fares.  *See* Mot. to Dismiss at 24–25.  But

"allowing a rival to sell a fungible good at a lower price" increases competition and harms a

competitor "as a matter of economic logic." *PSSI Global Services*, 983 F.3d at 11 (cleaned up)[7];

*see also Hisp. Affs. Project v. Perez*, 206 F. Supp. 3d 348, 371 (D.D.C.) ("The law does not

require the plaintiffs to allege with absolute certainty the sequence of events that will lead to the

plaintiff's redress—only that there be basic economic logic undergirding the plaintiffs' claims.")

(cleaned up), *aff'd sub nom. Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018).  Air

---

[6]  In its Reply, the Treasury argues that recent news reports reveal Air Excursions has delayed its entry into the relevant market because it needs time to "study and address the potential safety issues" with the type of aircraft it plans to use.  *See* Defs.' Reply at 6–7, ECF No. 22.  The Treasury argues these reports establish that Air Excursions "has not been able to enter the market for safety reasons entirely unrelated to FLOAT's alleged anticompetitive conduct." *Id.* at 7.  But this report is not inconsistent with Air Excursions' claims.  Air Excursions could have delayed entry into the market for more than one reason, and the Court must grant to Air Excursions "all inferences that can be derived from the facts alleged." *L. Xia*, 865 F.3d at 649 (cleaned up).  More, standing must be determined when the Complaint is filed.  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).  The article the Treasury cites was published several months after Air Excursions filed its Complaint.  *Compare* Compl. (filed Sept. 29, 2021), *with* Maggie Nelson, *Aleutian Airways delays launch to Unalaska to 'tighten up' safety*, KUCB (Nov. 17, 2021), https://www.kucb.org/regional/2021-11-17/aleutian-airways-delays-launch-to-unalaska-to-tighten-up-safety.

[7]  The Treasury maintains Air Excursions cannot rely on *PSSI Global Services* because it found no standing when the plaintiffs could not show they were a "*direct* and *current* competitor." *PSSI Global Services*, 983 F.3d at 11 (cleaned up).  But the plaintiffs there did not directly compete because they "provide[d] services almost exclusively abroad and [had] taken few steps to develop any United States markets." *Id.*  The Circuit added that even if the plaintiffs directly and currently competed, they had made no showing that the challenged order was likely to cause them financial injury. *Id.*  Contrast that with Air Excursions, which has taken concrete steps to enter the relevant market and has plausibly alleged the Treasury's subsidies to FLOAT harm it.

Excursions alleged FLOAT offers fares at subsidized prices because of the Treasury's payments. Removing those subsidies would force FLOAT to charge non-subsidized rates.[8]

Finally, Air Excursions must show that "the regulatory or statutory requirements it seeks to enforce were intended to protect it against such competitive injury." *Gull Airborne Instrus.*, 694 F.2d at 842.  The Treasury argues that Congress intended the PSP payments to minimize airline industry layoffs because of the pandemic, not regulate competition among air carriers. *See* Mot. to Dismiss at 22.  Thus, it contends that Air Excursions cannot maintain competitor standing under the three statutes at issue.

But a layoff is a layoff no matter if it occurs because of reduced flying during a pandemic or because the Treasury improperly subsidizes a competitor.  If Congress's goal in passing the CARES Act, the CAA, and the ARP was to prevent layoffs, it could have hardly desired these very statutes to cause layoffs.  And yet that is the very risk Air Excursions faces if FLOAT continues to offer subsidized, below-market fares.  Thus, Air Excursions seeks to enforce a statutory requirement intended to protect against the type of injury it faces.

None of this is to suggest the Treasury's standing arguments are frivolous.  Air Excursions' standing is a close call.  At a later stage of litigation, it might be unable to show standing based on the facts alleged.  But its burden at the 12(b)(6) stage is lower than at later stages.  *See, e.g.*, *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (stating that the "burden to demonstrate standing grows heavier at each stage of the litigation") (cleaned up); *see also Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 48 (D.C. Cir. 2016) ("A court's determination that a plaintiff has established standing at the motion

---

[8]  Because Air Excursions establishes standing based on the below-market fares, the Court need not assess causation and redressability for the lost business opportunity.

to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment."). Air Excursions has met its burden at this stage of the litigation.

The Court now proceeds to the merits.

## B.

The Treasury argues that the Court should dismiss the Complaint because Congress committed the terms of the PSP payments to its discretion and they are therefore unreviewable under the APA.[9] *See* Mot. to Dismiss at 28–34. In the alternative, it argues that Air Excursions fails to state a claim. *See id.* at 34–37. The Court considers each argument in turn.

## 1.

The Treasury argues that Congress committed the terms of the payments to its discretion and thus they are not reviewable under the APA. *See id.* at 28–34. Unreviewable actions committed to agency discretion fall into two categories. The first category includes discretionary administrative actions such as "a decision not to institute enforcement proceedings." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019). The second category contains actions arising from a statute that "is drawn so that a court would have no meaningful standard against which to

---

[9] The Treasury claims that review of the terms of the PSP payments is "*not justiciable* under the APA." Mot. to Dismiss at 28 (emphasis added). But the APA is not a jurisdiction-conferring statute. So when an agency's actions are committed to its discretion by law, the proper step for the Court to take is to dismiss the claim under 12(b)(6), not 12(b)(1). *See Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA. Therefore, the court has jurisdiction over his case pursuant to § 1331, but will properly grant a motion to dismiss the complaint for failure to state a claim."); *see also* Compl. ¶ 6 (asserting the Court has jurisdiction under 28 U.S.C. § 1331).

judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  The Treasury says both categories require dismissal of Air Excursions' claims.

Start with the second category—no meaningful standards for review.  Recall that the CARES Act says that "[f]inancial assistance provided to an air carrier or contractor under this part shall be in such form, *on such terms and conditions* (including requirements for audits and the clawback of any financial assistance provided upon failure by a passenger air carrier, cargo air carrier, or contractor to honor the [required assurances]), *as the Secretary determines appropriate*."  15 U.S.C. § 9073(b) (emphasis added).[10]  The application form used by entities seeking PSP payments says that the form "may be updated, revised, or modified at any time, and the requirements herein may be waived by the Secretary of the Treasury in his sole discretion to the extent permitted by law."  Leibenluft Decl. Ex. 2 at 6, ECF No. 17-1.  And all three PSP Agreements say their terms have the defined meanings "unless the context clearly requires otherwise."  *Id.* at 18 (first Agreement); *id.* Ex. 4 at 42 (second Agreement); *id.* Ex. 6 at 74 (third Agreement).  Based on these broad grants of discretion, the Treasury argues it had the authority to determine the meaning of the terms "successors" and "assigns" as used in the definition of "recipient" in the PSP Agreements.  *See* Mot. to Dismiss at 33.

Air Excursions rebuts the Treasury's argument in two ways.  *First*, it relies on *Confederated Tribes of Chehalis Reservation v. Mnuchin*, 456 F. Supp. 3d 152 (D.D.C. 2020), to argue that although "the Secretary's decisions as to *how* much to disburse [from CARES Act funds] might not be reviewable, his decisions concerning *to whom* to disburse those funds most

---

[10]  Similar language appears in the Consolidated Appropriates Act of 2021 and the American Rescue Plan Act of 2021.  *See* § 9093(b)(1)(A) (CAA); *id.* § 9141(b)(3)(A) (ARP).

certainly is." *Id.* at 161; *see* Pl.'s Opp'n at 27.  Thus, reasons Air Excursions, the Court can decide whether FLOAT is properly a successor or assignee to Old or New Corvus.

But in *Confederated Tribes*, the court reviewed a different part of the CARES Act dealing with distributions to "tribal governments." *See Confed. Tribes*, 569 F. Supp. 3d at 161. The question was whether for-profit "Alaska Native regional and village corporations" qualified as "tribal governments." *Id.* at 155.  Congress's directive that the Treasury disburse funds only to "tribal governments" gave the court a judicial standard to use in determining whether for-profit corporations were proper recipients. *See id.* at 160–161.  There is no similar standard here—at least, not one that is at issue.  The CARES Act does limit the funds at issue to "air carrier[s]," but neither party here contends that FLOAT is not an air carrier.  15 U.S.C. § 9073(b); *see also id.* § 9093(b)(1) (CAA applies to "eligible air carriers"); *id.* § 9141(b)(3)(A) (same for ARP).  Thus, *Confederated Tribes* does not apply.

*Second*, Air Excursions argues that even if the statute itself fails to provide a standard of review, the Court can use the PSP Agreements to review FLOAT's eligibility. *See* Pl.'s Opp'n at 28.  It maintains that a government contract can provide "'judicially manageable standards' for reviewing an agency's conduct under the APA." *Id.* (quoting *Vara v. DeVos*, No 19-12175, 2020 WL 3489679, at *25 (D. Mass. June 25, 2020)).  The PSP Agreements define "Recipient" to include "the Signatory Entity" and its "successors, and assigns." *Id.*  Thus, the Court may determine whether FLOAT constituted a "Recipient" as defined in the agreement.  And because the bankruptcy court stated FLOAT is not a successor, it is not a proper recipient under the Agreement.

But Air Excursions cites no authority for the proposition that a contract alone presents a judicially manageable standard of review for the APA—especially when a non-party to the

contract seeks its enforcement.  The unpublished, district court case it relies on for this proposition concluded that "contractual language drafted by and binding the agency" *together* with "statutory and regulatory text, the agency's published interpretations . . . [and] its settled course of adjudication" gave the court law to apply.  *See Vara*, 2020 WL 3489679, at *25.

To be sure, courts in this circuit occasionally rely on agency manuals, directives, regulations, and policy guidelines.  *See, e.g.*, *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 150 (D.D.C. 2018).  But unlike a clear policy statement or regulation, the PSP Agreements left substantial discretion with the Treasury.  For example, the Agreements state they "shall be construed in a manner consistent with any public guidance the Treasury may from time to time issue regarding the implementation" of the statutes.  Leibenluft Decl. Ex. 2 at 18 (first Agreement); *id.* Ex. 4 at 42 (second Agreement); *id.* Ex. 6 at 74 (third Agreement).  More, the Agreements grant the Secretary the discretion to "increase or reduce" the contracted amount. *See id*. Ex. 2 at 21 (first Agreement); *id.* Ex. 4 at 46 (second Agreement); *id.* Ex. 6 at 76 (third Agreement).  And under the Agreements, the Treasury could waive any of the requirements the Agreements imposed on a recipient.  *Id.* Ex. 2 at 30 (first Agreement); *id.* Ex. 4 at 56 (second Agreement); *id.* Ex. 6 at 85 (third Agreement).  Even granting that a contract alone can provide a judicially manageable standard of review, how can the Treasury act arbitrarily and capriciously under a contract that it has the authority to modify at any time?

That leaves the statute as the only potential judicially manageable standard of review. But the statute grants the Treasury total discretion.  Congress charged the Treasury with providing financial assistance on the terms that the Secretary "deems appropriate."  15 U.S.C. § 9073(b).  Language granting an agency this level of discretion makes the dispute unreviewable. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 600 (1988) (statute allowing termination "whenever the

Director 'shall *deem* such termination necessary or advisable in the interests of the United States'" is a standard that "fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review"); *Drake v. FAA*, 291 F.3d 59, 70–72 (D.C. Cir. 2002) (rejecting a challenge to the FAA's decision not to institute enforcement proceedings where the FAA could dismiss a complaint if it was "of the opinion" that investigation was unwarranted).

Now consider the second category of unreviewable actions.  This category includes "a decision not to institute enforcement proceedings."  *Dep't of Com.*, 139 S. Ct. at 2568.  Recall that the CARES Act says that "clawback of any financial assistance" must be on such terms "as the Secretary determines appropriate."  15 U.S.C. § 9073(b)(1)(A).  Demanding a clawback is materially identical to starting an enforcement action against a noncompliant recipient.  And the Supreme Court has repeatedly held that the decision of whether to bring enforcement actions is discretionary and thus unreviewable.  *See Heckler*, 470 U.S. at 831 (collecting cases) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

In sum, neither the statute nor the PSP Agreements provide a judicially manageable standard of review.  Even if they did, the statute unambiguously assigns decisions about clawback proceedings to the Treasury.  Air Excursions thus fails to state a claim.

**2.**

Air Excursions fails to state a claim for a second and independent reason.  Even granting its arguments that the statutes or the PSP Agreements provide the Court with a standard of review, Air Excursions misconstrues the bankruptcy court's Sale Order.

The Treasury makes several arguments on this point.  *First*, it suggests that Air Excursions misreads the Sale Order.  The Complaint identifies six instances in the Sale Order that state FLOAT is not the successor to Old Corvus.  *See* Compl. ¶ 33.  The Treasury argues that, in context, all these statements say FLOAT is not a successor for purpose of liabilities. Mot. to Dismiss at 34–35.  But the language of the Sale Order is not clear on this point.  Some sections support the Treasury's argument.  For example, Section VII.Q says that the "[b]uyer shall not be deemed to be a successor to the Debtors, or otherwise liable, *for any liability* of the Debtors under ERISA or otherwise."  Compl. ¶ 33 (emphasis added).  But Section V.32 says that the "[b]uyer shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity."  Compl. ¶ 33.  No language here constrains the "successor" language to liabilities.

Reading the Sale Order together with the Asset Purchase Agreement it approved, however, shows that the Treasury has the better interpretation.  The Agreement states that the buyer has the rights to the PSP funds.  *See In re Ravn Air Grp., Inc.*, No 20-10755 (Bankr. Del.), Asset Purchase Agreement § 7.2(e), ECF No. 492-1.[11]  Air Excursions acknowledges this.  *See* Compl. ¶ 32.  Thus, to read the "successor" language in the Order to mean the buyer does not have the rights to the PSP funds directly contradicts the Agreement that the Order approved.

Air Excursions' only rejoinder is to focus on New Corvus.  Pl.'s Opp'n at 31; Compl. ¶ 39.  Putting aside the language of the Order, if FLOAT was the true successor to Old Corvus,

---

[11]  Air Excursions attached the bankruptcy court's Sale Order to its Complaint but did not attach the Asset Purchase Agreement.  *See* ECF No. 13-1.  In determining whether a complaint states a claim, the Court may consider "any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Because the Sale Order refers to the Asset Purchase Agreement, *see* Sale Order at 1, the Court may consider both documents.

Air Excursions says, then New Corvus would not exist.  But as Air Excursions acknowledges, FLOAT bought all the capital stock of Old Corvus.  *See* Compl. ¶ 32.  New Corvus thus exists as a corporate entity, but with no assets or rights to the PSP payments.  It is therefore no surprise that the "actual recipient of the funds was FLOAT." *Id.* ¶ 38.  That the payments to Old and New Corvus ultimately benefitted FLOAT is exactly what one would expect given the Asset Purchase Agreement.

*Second*, the Treasury contends that Air Excursions focuses too closely on the word "successors" in the PSP Agreements.  *See* Mot. to Dismiss at 35.  The term "Recipient" includes not only "successors" but also "assigns."  Leibenluft Decl. Ex. 2 at 19.  So even if FLOAT is not the successor to Old Corvus, it can qualify as an assignee and thus be a proper "Recipient" of the PSP funds.  The Treasury notes that the Asset Purchase Agreement anticipates this because it states that the seller and buyer "shall use commercially reasonable efforts to . . . obtain Treasury approval of the *assignment* to Buyer of the PSP Agreement and disbursement of the PSP funds to Corvus."  Mot. to Dismiss at 35; *see also* Asset Purchase Agreement § 5.6(e).  A separate section of the Agreement makes the approval by the Treasury of the "*assignment* to Buyer of the PSP Agreement" a condition precedent of the sale.  *Id.* § 7.2(e) (emphasis added).

Air Excursions counters that the PSP Agreements provide that Corvus "has no right to, and shall not . . . assign this Agreement or any Payroll Support provided under this Agreement . . . to any party . . . without express written approval of Treasury."  Pl.'s Opp'n at 33.  Because the record does not reflect that the Treasury waived this requirement in writing, Air Excursions contends Corvus had no right to assign the PSP Agreements to FLOAT.  *Id.* at 33–34.

But the purpose of the anti-assignment provision was to protect the Treasury.  And the beneficiary of a condition in a contract may waive a condition in a contract that protects it.  *See Gatoil (U.S.A.), Inc. v. Wash. Metro. Area Transit Auth.*, 801 F.2d 451, 455 (D.C. Cir. 1986) ("It is true that . . . the beneficiary of the condition precedent[] had the power to excuse its failure."); *see also* 13 Williston on Contracts § 39:24 (4th ed.) ("[I]t is well settled that a contracting party may unilaterally waive a provision of the contract, including, as a general rule, any condition precedent which has been placed in the contract for that party's benefit.").  Thus, because the writing requirement existed to protect the Treasury, it could waive that requirement.  More, the PSP Agreements themselves stated the Treasury retained the authority to make alterations to the Agreements "in its sole discretion."[12]  Leibenluft Decl. Ex. 2 at 30 (first Agreement); *id.* Ex. 4 at 56 (second Agreement); *id.* Ex. 6 at 85 (third Agreement).

Air Excursions responds that "[a] court should not infer waiver from ambiguous factors." Pl.'s Opp'n at 34 (quoting *Landover Corp. v. Bellevue Masters LLC*, 252 F. App'x 800, 803 (9th Cir. 2007)).  But the factors here are not ambiguous.  The Treasury knew that Old Corvus had entered bankruptcy proceedings because, before the first disbursement, it executed a Bankruptcy Addendum to Payroll Support Program Agreement setting out new terms for how the PSP

---

[12]  Air Excursions maintains that the Treasury misreads Paragraph 47 of the Agreements, which give the Treasury the right to "waive any term or condition under this Agreement imposing a requirement on the Recipient[.]"  Leibenluft Decl. Ex. 2 ¶ 47.  Air Excursions says a "requirement" implies an affirmative obligation, but the requirement that Corvus only assign the PSP funds with the Treasury's written approval removed a right from it.  Pl.'s Opp'n at 34.  For this contention, Air Excursions cites a case in which *in context* a requirement imposed an affirmative obligation.  *See N.G. v. Dist. of Colum.*, 556 F. Supp. 2d 11, 25 (D.D.C. 2018) ("[T]he 'Child Find' obligation is an affirmative obligation").  But the ordinary meaning of "requirement" does not imply an affirmative obligation.  *See, e.g.*, OED Online, *Requirement* def. 3(a) (defining "requirement" as "[s]omething called for or demanded; a condition which must be complied with"), *available at* https://www.oed.com/view/Entry/ 163260?redirectedFrom=requirement#eid.

Agreement would operate in bankruptcy.  *See* Leibenluft Decl. Ex. 3.  The Bankruptcy

Addendum provides the Treasury the sole discretion to withhold payments to Old Corvus if it

determines that Old Corvus had not complied with the PSP Agreement or the Addendum.  *Id.*

¶ 6.  The Addendum also states that the Treasury could withhold payments if the bankruptcy

proceedings failed.  *Id.* ¶ 7(a).  So the Treasury expected that Old Corvus would go through with

the bankruptcy proceedings and, despite the knowledge that Old Corvus was in bankruptcy, it did

not place any additional limitations on its ability to assign the PSP Agreement.  More, even

knowing now that FLOAT was the beneficiary of the PSP Agreement, it has made no

determination that Old Corvus violated any of the PSP Agreements.  *See* Leibenluft Decl. ¶ 13.

*Third*, one of the Asset Purchase Agreement's conditions precedent is that the parties to

the Agreement obtain the approval of the Treasury to disburse the PSP funds to the buyer:

> Seller and Buyer shall use commercially reasonable efforts to
> cooperate, assist, and consult with each other through Closing in
> connection with Buyer's efforts to obtain Treasury approval of the
> assignment to Buyer of the PSP Agreement and disbursement of the
> PSP Funds to Corvus.

Asset Pur. Ag. § 5.6(e).

Air Excursions acknowledges the sale closed.  Compl. ¶ 34.  It contends that, after the

sale, the Treasury disbursed the funds on the "mistaken belief" that Old Corvus "was purchased

at auction due to bankruptcy."  *Id*. ¶ 35.  But it alleges no facts to suggest the Treasury was

fooled.  Nor does it explain why it makes any difference whether the Treasury believed FLOAT

bought Old Corvus as a whole versus FLOAT purchasing its capital stock and right to the PSP

payments.  Either way, FLOAT would be a successor to Old and New Corvus.  Although the

Court must draw all reasonable inferences in favor of Air Excursions, there is no reasonable

inference consistent with Air Excursions' version of events that explains the close of the sale.

*C.f. Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*,

No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019) (noting that courts must employ judicial experience and common sense when considering whether a complaint fails to state a claim).  The more reasonable inference is that the parties obtained the Treasury's consent and it chose to waive the writing requirement.

Thus, FLOAT is either the successor or assignee of Old and New Corvus and rightfully benefitted from the PSP payments.

**IV.**

For all these reasons, the Court will grant the Treasury's motion to dismiss.  A separate Order will issue.[13]

Dated: April 12, 2022                                TREVOR N. McFADDEN, U.S.D.J.

---

[13]  The Court will also deny Air Excursions' motion for leave to file a sur-reply.  *See* ECF No. 23.  Air Excursions claims the Treasury made a new argument in its reply brief:  New Corvus is the same corporation as Old Corvus and thus was either the "signatory entity" that entered into the first payroll support agreement or a "successor" of Old Corvus.  *See* Defs.' Reply at 18.  This responds to an argument Air Excursions raised in its opposition:  That the Corvus entity that submitted the first PSP Application no longer existed as of the closing of the sale.  See Pl.'s Opp'n at 8.  A moving party may raise new arguments in reply if they fall within issues raised by the opposing party in its opposition brief.  *See Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011).  In any event, the Court did not rely on this argument.  So granting Air Excursions' motion would not affect the outcome.